(C. D. 1381)

C. J. TOWER & SONS *v.* UNITED STATES

United States Customs Court, Second Division

(Decided December 18, 1951)

*Barnes, Richardson & Colburn* (*Eugene F. Blauvelt* of counsel) for the plaintiff.
*Charles J. Wagner,* Acting Assistant Attorney General (*Richard H. Welsh* and
*Richard F. Weeks,* special attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Importations of ingots in chief value of aluminum form the subject of this controversy. The collector of customs classified the merchandise as aluminum silicon and duty was assessed thereon at the rate of 5 cents per pound pursuant to the provisions of paragraph 302 (j) of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 302 (j)).

Plaintiff contends that the commodity is an aluminum alloy and is properly dutiable at the rate of 2 cents per pound, as provided in paragraph 374 of said act (19 U. S. C. § 1001, par. 374), as modified

by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, effective January 1, 1948. A claim for entry free of duty in accordance with Public Law 613 (62 Stat. 344) is not pressed and will not be considered.

By amendment of the protest an alternative claim is made that the merchandise is ferroaluminum silicon or ferrosilicon aluminum, not specially provided for, and that duty should be assessed thereon at the rate of 2½ cents per pound pursuant to the provisions in paragraph 302 (j) of said act, as modified by the trade agreement between the United States and Switzerland, 69 Treas. Dec. 74, T. D. 48093, effective February 15, 1936.

### THE STATUTES

Paragraph 302 (j), Tariff Act of 1930:

Silicon aluminum, aluminum silicon, alsimin, ferrosilicon aluminum, and ferro-aluminum silicon, 5 cents per pound.

Paragraph 374, as modified, *supra*, the pertinent portions being emphasized:

Aluminum, aluminum scrap, and *alloys (except those provided for in paragraph 302, Tariff Act of 1930) in which aluminum is the component material of chief value:*

| | |
|---|---|
| *In crude form* (except scrap) | 2¢ per lb. |
| In coils, plates, sheets, bars, rods, circles, disks, blanks, strips, rectangles, and squares | 3¢ per lb. |
| Scrap | 1½¢ per lb. |

Paragraph 302 (j), as modified, *supra*:

Alsimin, ferrosilicon aluminum, and ferroaluminum silicon:

| | |
|---|---|
| Containing 20 but not more than 52 per centum of aluminum, and having silicon and iron as the other principal component elements | 1¼¢ per lb. |
| Not specially provided for | 2½¢ per lb. |

At the trial three highly qualified witnesses were called, all of whom testified on behalf of the plaintiff, and their testimony stands unrebutted. Further reference will be made to these witnesses *infra*.

### THE EXHIBITS

Plaintiff introduced the following exhibits:

Collective exhibit 1, the purchase order for the imported material designated as "A2312 Secondary Aluminum per specification attached."

Exhibits 2, 3, and 4, small portions of ingots illustrating the imported merchandise.

Illustrative exhibit 5, a small bar of metal illustrating a casting metal.

Illustrative exhibit 6, a microphotograph of a cross-section of illustrative exhibit 5.

Collective exhibit 7, photostats of 8 pages from a book entitled TRANSACTIONS OF THE AMERICAN INSTITUTE OF MINING AND METALLURGICAL ENGINEERS, Vol. LXXIII, descriptive of "additive alloys" and "silicon casting alloys."

Illustrative exhibit 8, a small bar of metal containing 50 per centum silicon and 50 per centum aluminum.

Illustrative exhibit 9, a microphotograph of a cross-section of illustrative exhibit 8.

Illustrative exhibit 10, a small bar of metal illustrating an alloy of aluminum silicon in which the silicon content is 20 per centum, and aluminum 80 per centum.

Illustrative exhibit 11, a microphotograph of a cross-section of illustrative exhibit 10.

Exhibit 12, a pamphlet descriptive of alloys of the kind represented by collective exhibit 1.

---

The purchase order (collective exhibit 1) designates the merchandise as "A2312 Secondary Aluminum per specification attached," which was imported for use as a casting alloy.

The specification referred to sets forth the following requirements as to chemical composition:

| | |
|---|---|
| Silicon | 11.00—12.50% |
| Iron | Maximum— .85–1.0% |
| Copper | Maximum— 0.20% |
| Manganese | Maximum— 0.10% |
| Magnesium | Maximum— 0.05% |
| Zinc | Maximum— 0.10% |
| Nickel | Maximum— 0.10% |
| Other Elements | Total Maximum— 0.15% |

While the specification is silent with respect to the percentage of aluminum in the imported mixture, it is clearly inferable from the entire record and surrounding circumstances that the balance not given in the foregoing specification consists of aluminum in excess of 80 per centum. Counsel for both parties in their briefs state that aluminum represents the balance not expressly set forth. Furthermore, as will be disclosed *infra*, the elements which were thrown into the furnace in the production of the importations consisted of pure aluminum scrap, metallic silicon, and iron, the respective percentages of the latter two elements being definitely stated.

Plaintiff's witness Francis testified that he was president of Metals & Alloys, Ltd., Leaside, Ontario, and a graduate metallurgist from the University of Toronto; that he had worked for his company about 10 years and was familiar with the products manufactured by it,

including the imported commodity; that it was made in accordance with the specification quoted, *supra*, and after manufacture it was shipped to the Doehler Jarvis Corp. at Batavia, N. Y. Francis described the process of manufacture as follows:

Well, it is similar to that of all normal aluminum alloys. We use furnaces holding approximately fifteen tons——

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

The material going into the furnace of which this shipment was made would consist of such material as pure aluminum scrap, 2–S; a little bit of 3–S; foil, such as ordinary cigarette foil; rubber foil; all the other types of what is commonly called pure aluminum scrap. When that is molten in the furnace we would charge in metallic silicon. When we have the approximate content in the furnace, as well as the iron content specified in this particular material, we would analyze the heat while it is still molten in the furnace. Then we would have to add more silicon or more iron or more aluminum, depending upon that test analysis. When the material is to the correct composition then we merely pour it into ingot form and strap it and load it on the cars, and that is what our process consists of. Of course, when the material is molten it is fluxed with suitable fluxes to clean the dirt out of the metal. Some sodium would be added in the normal course of manufacture, which is quite normal with all aluminum alloys, and other than that there is no other treatment. Nothing is called for.

Analyses made by this witness, or under his supervision, established that the commodity was produced in accordance with the specification outlined in collective exhibit 1, *supra*.

The witness testified further that his company had made many tons of alloys similar to the importations in controversy; that they all contained silicon not to exceed approximately 13 per centum; that "Usually it runs 10½ to 12½, 11½ to say 13; rarely, if ever, over 13." He stated, however, that some of them would run as low as 1 or 2 per centum of silicon.

Francis also testified that his company had throughout his experience manufactured a material which he knows and sells as aluminum silicon or silicon aluminum in Canada; that it "is used for adding silicon to various aluminum alloys"; that it could not be used for casting; that to a metallurgist, aluminum silicon alloys or silicon aluminum alloys would be referred to as hardeners, master alloys, additive alloys; "They all mean the same thing." He identified a book referred to as the "American Institute of Mining and Metallurgical Engineers, Volume 73," as an authoritative publication, and photostats of certain pages were received in evidence as collective exhibit 7.

The witness produced a sample of merchandise representing what his firm manufactures as aluminum silicon containing approximately 50 per centum of silicon and 50 per centum of aluminum, which is sold to foundries in Canada. This is represented by illustrative exhibit 8. The witness explained that silicon is added to aluminum to make the latter stronger and quite ductile, but that 14 per centum is

the top limit of silicon content that can go into a finished alloy; that in the aluminum silicon made by his concern the lowest silicon content is 20 per centum, which is represented by illustrative exhibit 10. That commodity is sold in Canada but not to the United States.

Mr. Francis testified that the microphotograph represented by illustrative exhibit 6 discloses that the alloy represented by exhibits 2, 3, and 4, containing approximately 12 per centum silicon, is a eutectic material, which implies that it melts readily at a low temperature. He also stated that the alloy was uniform in composition in that the silicon, aluminum, and iron were evenly distributed throughout the material, being an important characteristic of casting alloys; that the microphotograph, illustrative exhibit 11, refers to an alloy containing 80 per centum aluminum and 20 per centum silicon, which the witness stated "demonstrates that the silicon in this material is in large particles un-uniformly distributed in the alloy. It demonstrates very very severe segregation."

Plaintiff's witness Pack testified that he has been associated with the firm of Doehler-Jarvis Co., the ultimate consignee of the importations, in various capacities for 39½ years, having been employed as chemist, metallurgist, production manager, and as vice president and president of the company; that his concern is engaged in the manufacture of die castings or pressure castings. He testified further that aluminum alloys such as those containing 80 per centum aluminum and 20 per centum silicon, or aluminum and silicon in equal proportions, were used as so-called additive or hardener alloys, whereas the imported alloy would be used as a "standard casting alloy applicable to all casting methods." He testified that an alloy "must have a certain tensile strength, a certain amount of ductility. Certainly, there is always a minimum amount of ductility must be had to be usable."

The third witness, Herbert O. Jarvis, testified that for 10 years he had been general manager of the Niagara Falls Smelting & Refining Division of Continental Copper & Steel Industries, manufacturer of metallic alloys; prior to that time, he held positions with the company as plant manager, metallurgist, and chemist at various times since 1923; that he was familiar with the products of his plant and with the constituents entering into them; that they had made an alloy "with a nominal composition of 50% silicon and 50% aluminum and one of 25% silicon and 75% aluminum"; that such alloys were used for the introduction of silicon into aluminum alloys which were intended for casting purposes. Jarvis also testified that he was familiar with an alloy similar to the alloy made in accordance with the specification shown in collective exhibit 1; that it was used in the manufacture of castings, without the addition of other metals; that he did not consider such an alloy to be within the meaning of the terms "aluminum silicon" or "silicon aluminum" "Because this is a casting alloy and it

is general practice to specify the specification number when purchasing aluminum casting alloys. These specifications control the impurities as well as the major constituents and in this particular case it controls both silicon and iron in major and minor, in minimum and maximum amounts and controls other impurities to a maximum amount as outlined here."

No other witnesses were called to testify.

It is contended by the plaintiff that the provisions for silicon aluminum and aluminum silicon are delimited by the factor of use and testimony was introduced designed to establish that fact. In other words, it is argued that an aluminum alloy like that in controversy which is used as a metal in casting is not an alloy which would be recognized as silicon aluminum or aluminum silicon; that those terms are limited by their common meaning to metallurgical, intermediate, or enricher alloys. Plaintiff also urges that this contention is reinforced by resort to the legislative history upon the subject. However, in view of the conclusion we have reached upon the record in the case, we deem these contentions academic and shall consider them only briefly.

It is elementary that tariff statutes are couched in terms of common speech rather than in terms of the scientist—the botanist, the chemist, or the metallurgist, for instance. Furthermore, there is a presumption that the common and commercial meanings of expressions employed to describe merchandise in our customs laws are the same unless convincing proof to the contrary is introduced. In many cases the courts have stated the rule substantially as follows:

\* \* \* tariff acts are not drawn in the terms of science, but in the language of commerce, which is presumptively that in common use. \* \* \*

*Hartmann Trunk Co.* v. *United States*, 27 C. C. P. A. (Customs) 254, C. A. D. 95. See also *Meyer & Lange et al.* v. *United States*, 6 Ct. Cust. Appls. 181, T. D. 35436; and *Bakelite Corporation et al.* v. *United States*, 16 Ct. Cust. Appls. 378, T. D. 43117, and cases therein cited. In the case before us no attempt has been made to establish a commercial meaning of the terms under consideration different from their common meaning.

In the light of these observations, we approach the problem before us in order to determine whether the commodity in controversy was properly classified by the collector of customs as aluminum silicon within the meaning of paragraph 302 (j), *supra*, or whether it should be classified as an alloy in chief value of aluminum within the scope of paragraph 374, as modified, *supra*, or as ferrosilicon aluminum as provided in paragraph 302 (j), as modified, *supra*.

Not only is the record bare of testimony as to the meaning of the terms "ferrosilicon aluminum" or "ferroaluminum silicon" but a search of many metallurgical and lexicographical authorities fails to

throw any enlightenment upon the subject. However, paragraph 302 (j), as modified, *supra*, in the absence of proof to the contrary, clearly indicates that the terms embrace those alloys in which iron, aluminum, and silicon are the principal component elements.

The language of said paragraph 302 (j) does not present any patent ambiguity, and we are not permitted to resort to extraneous circumstances to create an ambiguity where none exists. *Stone & Downer Co. et al. v. United States*, 12 Ct. Cust. Appls. 62, T. D. 40019.

In accordance with the principles of construction to which we have referred above, we must look to the common meaning of the statutory provisions to which reference has been made to ascertain which, if any, of them clearly describes the importations.

At the outset, we are satisfied that the merchandise was not, for reasons which will appear *infra*, properly classified for duty by the collector as aluminum silicon. To sustain that classification, we would be required to ignore the fact, as disclosed by the uncontradicted proof in the record, that the commodity is something more than aluminum silicon. The testimony of the witnesses for the plaintiff proves beyond question that the merchandise is the deliberate product of a mixture of aluminum, silicon, and iron, and they are described by the witnesses as the "principal component elements" in the imported ingots which were fabricated to meet the definite specification of the purchaser.

We shall consider first whether the imported commodity is provided for in paragraph 374, as modified, *supra*. It is unquestionably an alloy, admittedly in chief value of aluminum, in the shape of an ingot as it first appears in solid form after being in a molten state. It responds, therefore, to the terms of said paragraph 374, which provide in part for—

\* \* \* alloys (except those provided for in paragraph 302, Tariff Act of 1930) in which aluminum is the component material of chief value:

In crude form (except scrap) \* \* \*

However, before holding that the material should be so classified for duty purposes, we must determine whether it is "provided for in paragraph 302, Tariff Act of 1930," and consequently excepted from paragraph 374. Said paragraph 302, subsection (j), reads as follows:

Silicon aluminum, aluminum silicon, alsimin, ferrosilicon aluminum, and ferroaluminum silicon, 5 cents per pound.

It will be observed that paragraph 302 (j), as modified by the trade agreement with Switzerland, *supra*, provides for—

Alsimin, ferrosilicon aluminum, and ferroaluminum silicon:
Containing 20 but not more than 52 per centum of aluminum, and having silicon and iron as the other principal component elements_____ 1¼¢ per lb.
Not specially provided for_____ 2½¢ per lb.

The only limitation the trade negotiators saw fit to apply to those articles has reference to their aluminum content, specifically providing that when the named articles contain "20 but not more than 52 per centum of aluminum, and having silicon and iron as the other principal component elements," the rate of duty shall be 1¼ cents per pound. If, however, the named alloys contain less than 20 per centum or more than 52 per centum of aluminum and also contain silicon and iron as "the other principal component elements," they are subject to a duty of 2½ cents per pound pursuant to said paragraph 302 (j), as modified, *supra*.

It is not disputed that the merchandise before us is an alloy containing more than 52 per centum of aluminum and that the other principal component elements are silicon and iron. Since the record shows that these three elements were deliberately combined to form the imported alloy, we find upon the record that it clearly responds to the provision in paragraph 302 (j), as modified, *supra*, as "ferrosilicon aluminum * * * Not specially provided for," and dutiable at the rate of 2½ cents per pound, as alternatively claimed in the protest. That claim is therefore sustained, all other claims being overruled.

Judgment will be entered accordingly.