(C. D. 1498)

C. J. Tower & Sons *v.* United States

United States Customs Court, Second Division

(Decided February 11, 1953)

*Barnes, Richardson & Colburn (Eugene F. Blauvelt* of counsel) for the plaintiff. *Charles J. Wagner,* Acting Assistant Attorney General (*William J. Vitale,* special attorney), for the defendant.

Before Lawrence, Rao, and Ford, Judges

Lawrence, Judge: In *C. J. Tower & Sons* v. *United States,* 28 Cust. Ct. 1, C. D. 1381, we held that certain importations of ingots composed of aluminum, silicon, and iron as the principal component elements should properly be classified as ferrosilicon aluminum of the kind made dutiable at the rate of 2½ cents per pound in paragraph 302 (j) of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 302 (j)), as modified by the trade agreement between the United States and Switzerland, 69 Treas. Dec. 74, T. D. 48093.

In the case now before us, it is not disputed that the merchandise is substantially like that in the former *Tower* case with the notable exception that while iron was deliberately introduced as one of the principal component elements in the earlier case, it is not present in the instant case except as an unavoidable impurity which detracts from rather than adds to its commercial utility.

As in the previous case, the collector of customs classified the importation now under consideration as aluminum silicon pursuant to the terms of pargraph 302 (j) of the Tariff Act of 1930, and duty was imposed thereon at the rate of 5 cents per pound. The parties have agreed that the imported commodity is in chief value of aluminum. At the trial, the record in the original *Tower* case, *supra,* was incorporated and made a part of the record herein.

The substance of the testimony introduced in the combined cases

establishes that the imported product which is sometimes referred to as "Alcan 6018 alloy" is manufactured in the following manner: Refined bauxite, which chemically speaking is aluminum oxide, is placed in an electrolytic cell for the purpose of reducing it to aluminum metal and oxygen, which latter passes off as vapor while the aluminum metal becomes the aluminum of commerce. The term "electrolytic cell" was defined by plaintiff's witness Snelgrove as follows:

It is an industrial term, sir, applied to a large pot-like structure through which a current is passed. Within the structure and in contact with one of the electrodes, is the electrolytic material in which the ore of alumina dissolves in the dissolved state and attacked by the current, the aluminum falls to the bottom of the cell underneath the bath of the electrolyte and the oxygen, being a gas, raises and disappears out of the cell. It is comparable to an electric battery in a motor car where the reverse action gives current out.

Continuing his explanation of how the imported merchandise is produced, Snelgrove stated—

Metallic silicon in a calculated weight amount is added to the electrolytic cell. There it dissolves in the molten aluminum being generated by the cell or in the cell, and it disperses and expends itself homogeneously. It dissolves and expends itself in the metal, the aluminum metal in the cell itself.

The witness further explained that the only material added to the molten aluminum is silicon metal and that the iron content which might appear upon analysis is always present in commercial aluminum as an unavoidable impurity. It may be noted that copper, magnesium, and titanium likewise appear as unwanted impurities and, together with the iron content, are controlled within maximum limits, it being commercially impossible to produce aluminum without those impurities being present. The certificates of analysis, exhibits 1, 2, and 3, respectively, indicate that the imported commodity contains approximately 88 per centum of aluminum and 12 per centum of silicon with certain minor percentages of copper, iron, magnesium, and titanium, as above indicated.

It appears further from the testimonial record that the aluminum silicon alloy in controversy, which is imported in the form of pigs, is ready for use in that condition to be cast into articles of various forms.

As in the earlier *Tower* case, it is contended here that the imported product is not the aluminum silicon of said paragraph 302 (j), but properly falls within the provision in paragraph 374 of said act (19 U. S. C. § 1001, par. 374), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, which reads as follows, the portion here pertinent being stressed:

Aluminum, aluminum scrap, and *alloys (except those provided for in paragraph 302, Tariff Act of 1930) in which aluminum is the component material of chief value*:

    *In crude form* (except scrap) _____ *2¢ per lb.*
    In coils, plates, sheets, bars, rods, circles, disks, blanks, strips, rectangles, and squares_____ *3¢ per lb.*

Upon this phase of the case, we said in the former *Tower* controversy, and which is equally applicable here—

It is contended by the plaintiff that the provisions for silicon aluminum and aluminum silicon are delimited by the factor of use and testimony was introduced designed to establish that fact. In other words, it is argued that an aluminum alloy like that in controversy which is used as a metal in casting is not an alloy which would be recognized as silicon aluminum or aluminum silicon; that those terms are limited by their common meaning to metallurgical, intermediate, or enricher alloys. Plaintiff also urges that this contention is reinforced by resort to the legislative history upon the subject. However, in view of the conclusion we have reached upon the record in the case, we deem these contentions academic and shall consider them only briefly.

Further, we said—

It is elementary that tariff statutes are couched in terms of common speech rather than in terms of the scientist—the botanist, the chemist, or the metallurgist, for instance. Furthermore, there is a presumption that the common and commerical meanings of expressions employed to describe merchandise in our customs laws are the same unless convincing proof to the contrary is introduced. In many cases the courts have stated the rule substantially as follows:

> \* \* \* tariff acts are not drawn in the terms of science, but in the language of commerce, which is presumptively that in common use. \* \* \*

*Hartmann Trunk Co.* v. *United States*, 27 C. C. P. A. (Customs) 254, C. A. D. 95. See also *Meyer & Lange et al.* v. *United States*, 6 Ct. Cust. Appls. 181, T. D. 35436; and *Bakelite Corporation et al.* v. *United States*, 16 Ct. Cust. Appls. 378, T. D. 43117, and cases therein cited. In the case before us no attempt has been made to establish a commercial meaning of the terms under consideration different from their common meaning.

We also pointed out with respect to the commodity that—

\* \* \* It is unquestionably an alloy, admittedly in chief value of aluminum, in the shape of an ingot as it first appears in solid form after being in a molten state. It responds, therefore, to the terms of said paragraph 374, which provide in part for—

> \* \* \* alloys (except those provided for in paragraph 302, Tariff Act of 1930) in which aluminum is the component material of chief value:
> In crude form (except scrap) \* \* \*

We then said—

However, before holding that the material should be so classified for duty purposes, we must determine whether it is "provided for in paragraph 302, Tariff Act of 1930," and consequently excepted from paragraph 374. \* \* \*

Said paragraph 302 (j) enumerates—

Silicon aluminum, aluminum silicon, alsimin, ferrosilicon aluminum, and ferroaluminum silicon, 5 cents per pound.

When the negotiators prepared the modification of said paragraph which became effective in the trade agreement between the United States and Switzerland, 69 Treas. Dec. 74, T. D. 48093, silicon aluminum and aluminum silicon were not included with the items in paragraph 302 (j) which were given special benefits. In other words,

the negotiators confined their interest to those items in paragraph 302 (j) which are indicated as ferrous alloys, namely, alsimin, ferrosilicon aluminum, and ferroaluminum silicon, and, for the first time in the treatment of this paragraph, embodied the following qualifications:

Containing 20 but not more than 52 per centum of aluminum, and having silicon and iron as the other principal component elements_____ 1¼¢ per lb.
Not specially provided for_____ 2½¢ per lb.

After referring to these considerations in our decision in the former *Tower* case, we concluded our opinion by observing—

It is not disputed that the merchandise before us is an alloy containing more then 52 per centum of aluminum and that the other principal component elements are silicon and iron. Since the record shows that these three elements were deliberately combined to form the imported alloy, we find upon the record that it clearly responds to the provision in paragraph 302 (j), as modified, *supra*, as "ferrosilicon aluminum * * * Not specially provided for," and dutiable at the rate of 2½ cents per pound, as alternatively claimed in the protest. * * *

Since the imported merchandise in the present case does not contain iron except as an adventitious impurity, we are of the opinion that it should not be classified for tariff purposes as a ferrous alloy within the meaning of paragraph 302 (j) but that it was properly classified by the collector in the same paragraph as aluminum silicon.

It will be noted that the articles enumerated in paragraph 302 (j) are unqualified as to use, relative percentages of their constituent parts, or in any other respect, and, as above pointed out, not until paragraph 302 (j) was modified by the Swiss Trade Agreement, *supra*, was any limitation imposed upon the items which were to receive the benefits of the trade agreement and which applied only to. the ferrous aluminum silicon alloys.

The testimony introduced in the present proceedings is merely cumulative of that introduced in the former *Tower* case and is an attempt to show that the terms used in paragraph 302 (j) are limited by the factor of use of the commodity. In substance, it is an attempt to inject the element of doubt or ambiguity where none exists. We are of the opinion that nothing has been here produced to change the conclusion arrived at in our earlier decision to the effect that—

The language of said paragraph 302 (j) does not present any patent ambiguity, and we are not permitted to resort to extraneous circumstances to create an ambiguity where none exists. *Stone & Downer Co. et al.* v. *United States*, 12 Ct. Cust. Appls. 62, T. D. 40019.

As we pointed out in the *Tower* case, *supra*, the only limitation the trade negotiators saw fit to apply to the provisions of paragraph 302 (j) concerned the aluminum content of the ferrous aluminum silicon alloys. Had the Congress or the negotiators intended that

the provisions of said paragraph 302 (j) as originally drawn or as modified should depend upon considerations of use or any other qualification, it would have been a simple matter to have so provided.

After due consideration of the issue presented and a careful review of the record before us, we are of the opinion that the attempt of plaintiff to establish that the provisions for silicon aluminum and aluminum silicon do not embrace those alloys when used for casting purposes but only when employed as so-called hardeners, master alloys, and additive alloys, is without merit.

For the reasons set forth above, the protest of plaintiff is overruled in all respects, and judgment will be entered in conformity with the foregoing opinion.