(C. D. 1826)

C. J. TOWER & SONS v. UNITED STATES

United States Customs Court, Second Division

(Decided November 29, 1956)

*Barnes, Richardson & Colburn* (*Eugene F. Blauvelt* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Richard M. Kozinn* and
*Henry J. O'Neill*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: This case is, in substance, a retrial of the issue that was before us in *C. J. Tower & Sons* v. *United States*, 30 Cust. Ct. 72, C. D. 1498 (affirmed *id.* v. *id.*, 41 C. C. P. A. (Customs) 195, C. A. D. 550), wherein it was held that certain importations of ingots, composed of aluminum silicon in percentages of approximately 88 per centum aluminum and 12 per centum silicon, together with certain adventitious impurities, were properly classified by the collector of customs as silicon aluminum of the kind made dutiable at 5 cents per pound in paragraph 302 (j) of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 302 (j)).

It is the claim of plaintiff that the commodity should be classified as an alloy in chief value of aluminum in crude form and dutiable at the rate of 2 cents per pound within the provisions of paragraph 374 of said act (19 U. S. C. § 1001, par. 374), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802.

In the *Tower* case, *supra*, we followed in principle our decision in *C. J. Tower & Sons* v. *United States*, 28 Cust. Ct. 1, C. D. 1381, which related to substantially similar merchandise, except that in the first *Tower* case a small percentage of iron was deliberately introduced as one of the principal component elements. The records in the two *Tower* cases were consolidated and are now before us by incorporation herein (defendant's exhibit A), it appearing that the merchandise and the issue in the second *Tower* case are identical with those in the present controversy.

The text of the competing statutory provisions herein is set forth below:

Paragraph 302 (j), Tariff Act of 1930:

Silicon aluminum, aluminum silicon, alsimin, ferrosilicon aluminum, and ferroaluminum silicon, 5 cents per pound.

On July 18, 1932, the 5 cents per pound rate on—

* * * alsimin, ferrosilicon aluminum, and ferroaluminum silicon, all the foregoing containing 20 but not more than 52 per centum of aluminum, and having silicon and iron as the other principal component elements * * *

was reduced to 2½ cents per pound by Presidential proclamation, under the authority of section 336, Tariff Act of 1930, reported in T. D. 45762.

The trade agreement with Switzerland, T. D. 48093, February 15, 1936, further reduced the rate:

| Tariff Act of 1930, paragraph | Description of articles | Rate of duty |
|---|---|---|
| 302 (j) | Alsimin, ferrosilicon aluminum, and ferroaluminum silicon:<br>  Containing 20 but not more than 52 per centum of aluminum, and having silicon and iron as the other principal component elements_____<br>  Not specially provided for_____ | 1¼¢ per lb.<br>2½¢ per lb. |

Paragraph 374, as amended by the General Agreement on Tariffs and Trade, January 1, 1948, T. D. 51802:

| Tariff Act of 1930, paragraph | Description of Products | Rate of Duty |
|---|---|---|
| 374 | Aluminum, aluminum scrap, and alloys (except those provided for in paragraph 302, Tariff Act of 1930) in which aluminum is the component material of chief value:<br>  In crude form (except scrap)_____<br>  In coils, plates, sheets, bars, rods, circles, disks, blanks, strips, rectangles, and squares_____<br>  Scrap_____ | 2¢ per lb.<br><br>3¢ per lb.<br>1½¢ per lb. |

It is not disputed that the subject merchandise, referred to as "Alcan 6018 alloy," is in chief value of aluminum.

At the present trial, the following exhibits were introduced in evidence by plaintiff:

Exhibit 1—"Certificate of Analysis," dated November 16, 1950, of the subject merchandise.

Exhibit 2—Large bar of the imported merchandise.

Exhibit 3—Small piece of exhibit 2. It was stipulated that exhibits 2 and 3 were representative of the imported material, which is identified as Alcan 6018 alloy.

Collective exhibit 4—Two pieces, known as 50–50 aluminum silicon.

Collective exhibit 5—Two pieces, known as 75–25 aluminum silicon.

The testimony in the incorporated cases as well as that in the present case was all introduced on behalf of the plaintiff. At the hearing herein, plaintiff called several witnesses, namely:

Andrew Edmund Saint John, president of Alloys & Products, Inc., whose testimony was primarily for the purpose of identifying exhibits 4 and 5.

Jacob B. Neiman, in the nonferrous metal business some 50 years; familiar with aluminum, bronze, and brass alloys; member of several societies interested in aluminum alloys and various metals; and, prior to 1930, actively engaged in selling aluminum alloy ingots and intermediate alloys to the foundry and die-casting trade.

He stated that the terms "aluminum silicon" and "silicon aluminum" were used interchangeably, regardless of the relative percentages of those elements. When asked what type or kind of aluminum silicon mixtures was included in the commercial meaning of the words "aluminum silicon," he replied, "Any admixture of silicon aluminum or aluminum and silicon above a minimum silicon content of approximately 25 per cent, I would say," which would be represented by exhibits 4 and 5. On cross-examination, the witness admitted that exhibits 4 and 5 could be termed as intermediate alloys. At another point, he said they were not alloys, as also did plaintiff's witnesses Weil and Jarvis.

The attention of the witness was invited to page 591 of collective exhibit 7 in protest 151906–K, which was decided in C. D. 1381 (the first of the incorporated cases), with specific reference to table 1, sample numbers 3850, 3864, 3950, and 4024, containing the following percentages of silicon, respectively, 17.08, 16.48, 16., and 15.95, which he stated were "Called silicon rich alloy."

The witness testified that, prior to 1930, there were so-called hardener alloys, other than aluminum silicon, such as copper aluminum, iron aluminum, manganese aluminum, nickel aluminum, titanium aluminum, and chromium aluminum.

When asked if exhibit 2 was known as aluminum silicon casting alloy, he replied, "No, sir; known by a number."

X Q. Aside from the number, based upon its composition.—A. Could be, yes.

Although the witness stated that "It was not called an aluminum silicon casting alloy," he did state that "12 per cent silicon alloy had various names. Aluminum Company called it Number 47 alloy."

Plaintiff's witness Harry J. Hater testified that he had held various executive positions in the aluminum industrial field; that, in the years immediately prior to 1930, he bought material, known as aluminum silicon or silicon aluminum, and he recognized exhibits 4 and 5 as representing aluminum silicon. However, the witness stated that he had never used a 12 per centum aluminum silicon alloy. When asked, on cross-examination, whether exhibits 4, 5, 2, and 3 were aluminum alloys, the witness replied:

I would call these just aluminum silicon or silicon aluminum, on Exhibits 5 and 4. This, Exhibit 3, I would consider that aluminum silicon alloy.

Plaintiff's next witness, Walter M. Weil, testified that he had been manufacturing aluminum alloys since 1909 and had purchased material similar to exhibits 4 and 5 in large quantities in the years immediately prior to 1930 for use in making aluminum alloys. He testified that the terms "aluminum silicon" and "silicon aluminum" were used indiscriminately and interchangeably and were limited to those mixtures of aluminum and silicon which he claimed were not alloys. He stated that the minimum silicon content of any material which he knew as aluminum silicon would be approximately 25 per centum.

On cross-examination, he testified that he manufactured merchandise similar to exhibits 2 and 3 prior to 1930 which was sold as an aluminum alloy. His customers ordered it "By specification number—almost always it was known as Alloy Number So-and-So, Alloy Number 47 was the name was applicable to it."

Weil also testified that exhibits 4 and 5 were mixtures and not alloys.

On re-cross-examination, Weil was asked whether merchandise like exhibit 2 was known in the trade prior to June 17, 1930, as an aluminum silicon alloy or an aluminum silicon casting alloy, and he replied:

You asked me that question before, and I told you that we made millions of pounds of it, and we called it aluminum.

Importer's next witness, Ernest G. Jarvis, testified to 40 years' experience with aluminum alloys of various kinds, having acted in the capacity of both manufacturer and salesman. When asked if there was a uniform, definite, and general meaning for the words "aluminum silicon" and "silicon aluminum" in the wholesale trade prior to 1930, Jarvis replied:

Well, silicon aluminum and aluminum silicon are just two different means or way of saying the same thing. * * * I have sold the whole 200 foundries in the country, practically, and those heads of the division call it silicon aluminum and

aluminum silicon. Aluminum silicon is a mixture of silicon, 25 per cent, up to 60 silicon content. Some fellows call them alloys; call them hardeners, rich mixtures, and everything else, but they are truly mixtures.

He also testified that a 12 per centum silicon aluminum casting alloy, such as exhibit 2, would not be recognized in the trade as aluminum silicon, but as "Alloy 47."

The attention of Jarvis was drawn to the testimony of his brother, Herbert O. Jarvis, on page 98 of the incorporated record, in which the latter had stated that a 50 per centum silicon and 50 per centum aluminum combination would be described as an alloy, and, in answer to the question as to whether or not he would call that an alloy, he had said, "I would call that an aluminum silicon alloy." On this point, the brothers were in disagreement.

The next witness, Clyde M. Adams, testified that he is vice president and a director of the Bohn Aluminum & Brass Corp., having been with that company since 1924 and with its predecessor and another company engaged in the aluminum business since 1915; that it manufactures castings, pistons for automotive use, extrusions, forgings, and various other products; that he purchased material similar to exhibits 4 and 5 immediately prior to 1930 and was familiar with the trade meaning of the term "aluminum silicon," which was applied to mixtures of those two elements, approximately 25 per centum silicon and 75 per centum aluminum, or 50 per centum of each of those elements, and that the term would exclude such merchandise as is represented by exhibits 2 and 3, although the witness testified that his familiarity with an alloy of that type was some time subsequent to 1930.

He also testified to the differences in the physical structure of exhibits 2 and 3 when compared with exhibits 4 and 5 and to the differences in their uses.

Plaintiff's last witness, Louis Lippa, testified that he has been vice president and secretary of the Apex Smelting Co. since 1923, its business being aluminum smeltering—producing aluminum alloys and aluminum additives; that, prior to 1930, he was familiar with the material known as silicon aluminum or aluminum silicon; that those names had a definite and uniform meaning in the wholesale trade, which, he stated, "was usually material that was used as an additive, which had a large percentage of certain material, in this particular case it happened to be silicon," and aluminum, the minimum silicon content being 25 per centum; that the maximum silicon content was between 50 and 60 per centum, but the term never included a 12 per centum silicon casting alloy.

A detailed analysis of the incorporated records would demand too much space to justify it. However, reference will be made to certain portions thereof deemed to be particularly pertinent.

In the second *Tower* case, C. D. 1498, *supra*, Joseph C. Fox testified that the Alcan 6018 alloy involved in the importations there under consideration contained a maximum iron content of six-tenths of 1 per centum. That is the commodity said to be identical with the importation in controversy here. Further, Fox testified that, after importation, iron was added to the extent of a half of 1 per centum "To facilitate casting; to prevent the castings from sticking to the steel die and you invariably find it necessary to use a little iron—a little higher iron content." He further stated that "The standard specifications for die castings in the form of die castings call for a maximum of 1.3 per cent iron."

In the first *Tower* case, C. D. 1381, *supra*, plaintiff's witness Francis, then president of the Metals & Alloys, Ltd., Leaside, Ontario, a graduate metallurgist and familiar with the products manufactured by this company, when asked, on cross-examination, if exhibits 2, 3, and 4, illustrating the merchandise then before the court, were sold under trade names, answered in the negative. Nevertheless, he testified that they were sold as "A 2132, as aluminum alloy number such and such." When asked, "What is an alloy, in your opinion?" Francis replied, "An alloy is a mixture of any two metals. That is a very technical definition." He definitely stated that the merchandise represented by illustrative exhibit 8, containing 50 per centum silicon and 50 per centum aluminum, and illustrative exhibit 10, containing 20 per centum silicon, is not an aluminum alloy; that it is aluminum silicon, a mixture of the two elements.

Plaintiff's witness Charles Pack, associated with the Doehler-Jarvis Co., engaged in the production of castings from nonferrous materials, including aluminum casting alloys, with 30 years' experience, was interrogated with respect to material represented by exhibit 10 therein, containing 20 per centum silicon and 80 per centum aluminum, which, he stated, he purchased under the name of aluminum silicon hardener, generally. When asked for what purposes it was used, he replied, "It is used as an additive, so-called *additive alloy* or a hardener." When asked what type of metal is comprehended by the words "aluminum silicon," Pack replied, "When we use that type of phraseology the nomenclature of aluminum silicon, aluminum copper, aluminum iron, we are talking of *additive alloys* of metals that are not used as such in casting or fabricating but used in what we call metallurgical process in making other alloys." [Italics supplied.]

Pack defined the word "alloy" as follows:

The definition of alloy—I think Webster will agree with me—is a mixture or a solid solution of two or more metals.

He then identified exhibits 2, 3, and 4 in that case as aluminum alloys.

When his attention was invited to exhibit 8, which contains 50 per centum silicon and 50 per centum aluminum, and was asked if that is an alloy, he replied, "Well, it's an alloy."

X Q. Aluminum alloy?—A. I think the metallurgists have some license and I should say when I gave you the definition of alloy let us assume, aluminum alloy, let us assume that aluminum is in the preponderance. That you can call a silicon alloy, if you want to or aluminum alloy.

X Q. Illustrative Exhibit Eight?—A. That's correct. I say it could be called a silicon alloy or an aluminum alloy because neither is in preponderance.

The cross-examination continues as follows:

X Q. Illustrative Exhibit Ten, I believe, is 20% silicon and 80% aluminum. Is that an aluminum alloy?—A. It is an aluminum alloy, correct.

X Q. Illustrative Exhibit Ten is just as much an aluminum alloy as Exhibits Two, Three and Four, is it not?—A. I don't know what you call degree but they all could be called aluminum alloys.

*        *        *        *        *        *        *

X Q. If you want an order for aluminum silicon does this mean anything?— A. It does.

X Q. What does it mean?—A. It means usually a hardening alloy, in the vernacular of the trade.

Briefly reviewing this litigation, it appears that, in the first *Tower* case (C. D. 1381), the merchandise was designated as "A2312 Secondary Aluminum per specification attached," and the specifications as to chemical composition were given as: Silicon, 11.00 to 12.50 per centum; iron, maximum, 0.85 to 1.0 per centum; and the balance (except for impurities, amounting to less than 1.0 per centum) consisting of aluminum. It appears further that the iron was deliberately added as an important component and, for that reason, we excluded the merchandise from classification as aluminum silicon, which was adopted by the collector of customs, and held that the commodity should be classified as ferrosilicon aluminum. It was there contended by plaintiff that, since the aluminum alloy in controversy was used as a casting metal, it was not an alloy which would be recognized as silicon aluminum or aluminum silicon, upon the theory that those terms were limited by their common meaning to metallurgical, intermediate, or enricher alloys.

On reviewing the testimony and examining the tariff structure of paragraph 302 (j), as modified, we were satisfied that the imported commodity was excepted from the provisions of paragraph 374, which provides for alloys in chief value of aluminum, except those provided for in paragraph 302 (j).

In the second *Tower* case (C. D. 1498), we found that the merchandise was substantially like that in the former *Tower* case, with the notable exception that, while iron was deliberately introduced as one of the principal component elements in the earlier case, it was not present in the second case, except as an unavoidable impurity. It is

noteworthy that, in the second *Tower* case, in which the commodity was identified as Alcan 6018 alloy, the maximum percentage of iron was 0.6 per centum, whereas in the earlier case, as pointed out above, the maximum was 0.85 to 1.0 per centum. However, that difference in the percentage of iron was a substantial one from an industrial viewpoint. The purpose of adding iron, as stated by the witness Fox (ex. "A," p. 14), is "To facilitate casting; to prevent the castings from sticking to the steel die and you invariably find it necessary to use a little iron—a little higher iron content."

As in the earlier case, the merchandise in controversy was, in its imported condition, ready for use for casting purposes. The case was presented to the court upon substantially the same theory as the earlier one, it being contended that the use of the commodity for casting removed it from the class of merchandise known as silicon aluminum or aluminum silicon. We again referred to the action of the negotiators of the Swiss Trade Agreement, when the duty on some of the products in paragraph 302 (j) was reduced, pointing out that the only limitation the negotiators saw fit to apply to the provisions in paragraph 302 (j) concerned the aluminum content of the ferro-silicon aluminum alloys.

On appeal, our judgment in C. D. 1498, *supra*, was affirmed in 41 C. C. P. A. (Customs) 195, C. A. D. 550. In its opinion, the appellate court observed:

There can be no doubt but that the goods of the involved importation are in chief value of aluminum under paragraph 374 *supra* but it is also clear that there are aluminum silicon alloys provided for under paragraph 302 (j) *supra*. It is also to be observed that in paragraph 374 *supra* the alloys provided for in paragraph 302 (j) *supra* of the act are excepted and, therefore, such goods are properly dutiable as classified by the collector unless the provision is restricted by the factor of use.

The court also referred to the claim of appellant therein that—

* * * Congress intended to limit the scope of provision for "aluminum silicon" to aluminum silicon alloys that are used as enricher or additive alloys and not those used as casting alloys, as is the present importation.

In reply to that argument, the court stated:

It is clear to us from a reading of the statute that Congress intended that the involved merchandise should be classified as "aluminum silicon." The provision for that material is clear and unambiguous and not restricted by use or any other qualification.

Plaintiff now contends that the earlier *Tower* cases, above discussed, are not controlling, asserting that the record, as now presented to the court, establishes that the term "silicon aluminum" or "aluminum silicon," as used in paragraph 302 (j), is limited in its scope to that type of aluminum silicon in which the percentages of silicon and aluminum are either 25 and 75 or 50 and 50, respectively, and that, consequently, the silicon aluminum of this importation, containing

approximately 12 per centum silicon and 88 per centum aluminum and used primarily in the production of castings, is not embraced within the term "silicon aluminum."

Assuming *arguendo* that the trade does draw a distinction between the aluminum alloys used for castings and those used as additives or hardeners, we are of the opinion that this is an instance where the principle of commercial designation, which is a rule of construction, must yield, if the intent of Congress be otherwise expressed.

In *United States* v. *Stone & Downer Company et al.*, 274 U. S. 225, the Supreme Court of the United States reviewed earlier decisions of that court, giving expression to the above doctrine, notably *Cadwalader* v. *Zeh*, 151 U. S. 171, 176, and *Robertson* v. *Salomon*, 130 U. S. 412, 415, and made the following observation:

> What we hold here is that Congress, by using the expression "commonly known as clothing wool," indicated expressly its intention not to give to the expression "clothing wool" the commercial designation that it has when used in contrast with combing wool, and that the history of the legislation shows that the trade or commercial meaning is contrary to the purpose of Congress in the enactment of the law. In other words, the authorities upon which the Court of Customs Appeals proceeded we think have no application to the interpretation of this act, save as they recognized that in the last analysis effect must be given to the intention of Congress.

In *United States* v. *Stone & Downer Co. et al.*, 16 Ct. Cust. Appls. 82, T. D. 42732, the question before the court was whether certain asbestos shingles were entitled to free entry, since "shingles" were *eo nomine* provided for in the Tariff Act of 1922, or were dutiable as manufactures of asbestos. In the course of its opinion, the court stated that—

> * * * a large number of witnesses were called by each party, in an attempt to prove or disprove a commercial designation of the word "shingles" sufficient to include the imported merchandise. * * *

The court quoted from its earlier decision in the case of *Hampton, Jr., & Co.* v. *United States*, 12 Ct. Cust. Appls. 490, T. D. 40695, likewise involving asbestos shingles, as follows:

> It is apparent from an examination of the various provisions of our Tariff Acts that the word "shingles," as used therein, has been used to indicate a manufacture of wood.

Recognizing the force and effect of the rule that when merchandise has a general, definite, and uniform signification in trade and commerce different from the ordinary meaning the commercial designation must prevail, the court further stated:

> But this rule has its limitations. If, in the consideration of a statute, it appears, from its language or from its context, from the legislative history of the act, or from other material facts, that it was the intent of the legislative body to restrict the meaning of the words used to their common meaning, then any

commercial meaning which the words employed in the act may have must yield to the legislative intent, which is, after all, the major guide to construction.

Accordingly, the court held:

\* \* \* that the congressional intent was to limit the meaning of the word "shingles," in paragraph 1660, to articles made, in a tariff sense, of wood. Especially must we come to this conclusion, in view of the fact that paragraph 1401 provides for all other manufactures composed wholly or in chief value of asbestos, from which it seems clear that the Congress did not intend that proof of commercial designation should remove from that paragraph shingles composed wholly or in chief value of asbestos.

Note also *Pacific Vegetable Oil Co.* v. *United States*, 32 C. C. P. A. (Customs) 68, C. A. D. 287.

Applying the doctrine of the cases above discussed, we are of the opinion that the provisions of paragraph 302 are to be read and applied in accordance with their common and popular signification.

Plaintiff's brief states that—

\* \* \* It must be noted that Par. 302 (j) of the Tariff Act of 1930 does not contain the word "alloy". The omission of this word from the paragraph is significant in the light of the testimony of all of these witnesses who consistently stated that they would not consider aluminum silicon or silicon aluminum represented by collective Exhibits 4 and 5 [being the 25–75 and 50–50 combinations] to be an alloy; all of them referred to it *as a mixture*. On the other hand, all of these witnesses referred to Exhibit 2 as an aluminum alloy. \* \* \* [Italics supplied.]

If, as above indicated, it was designed to establish by trade testimony that the merchandise represented by exhibit 2 is an aluminum alloy, but that represented by exhibits 4 and 5 is a mixture "as distinguished from an alloy," we are then led to inquire: What did Congress mean when it excepted from the terms of paragraph 374 alloys provided for in paragraph 302, Tariff Act of 1930?

Plaintiff suggests that—

\* \* \* It is unimportant whether or not material like collective Exhibits 4 and 5 are alloys or mixtures for the purposes of this case because the word alloy was not used in conjunction with the *eo nomine* provision for aluminum silicon in the Tariff Act. \* \* \*

It is our considered opinion, however, that the conclusion drawn by plaintiff that the omission of the word "alloy" from paragraph 302 (j) is "significant," for reasons above indicated, is without merit. The true significance, as we see it, of the omission of the word "alloy" from paragraph 302 (j), when considered in conjunction with the clause in paragraph 374, which excepts from its benefits those alloys composed in chief value of aluminum "provided for in paragraph 302," clearly indicates that Congress recognized that all of the products in paragraph 302 (j) were alloys, and, therefore, without repeating by name each of the exemplar products in paragraph 302 (j), referred to them in the one word "alloys."

Since the imported commodity—Alcan 6018 alloy—is, in fact, in truth, and in substance, silicon aluminum or aluminum silicon, it would present an anomalous situation to conclude that, although admittedly an alloy, it is not excluded from paragraph 374 upon the theory that it is not silicon aluminum, because of its intended use or of an alleged trade understanding, but that the same product, containing a fraction of a per centum of iron deliberately added, would be excluded from paragraph 374 as ferrosilicon aluminum, as held in the first *Tower* case.

It is well to point out that a comparison of the Tariff Acts of 1922 and of 1930 discloses that the aluminum alloys enumerated in subparagraph (j) of paragraph 302 first appeared in the Tariff Act of 1930, which would supply adequate and sufficient reason for the excepting clause inserted in paragraph 374 of the latter act which did not appear in the Tariff Act of 1922.

Moreover, as we pointed out in the first and second *Tower* cases, Congress, in the original enactment of paragraph 302 (j), was not concerned with the character, condition, or use of the silicon aluminum products enumerated therein. This is clearly indicated by the fact that, in the trade agreement with Switzerland, *supra*, in reducing the rate of duty upon alsimin and ferrosilicon aluminum, the only limitation placed upon those products was that they should contain 20, but not more than 52, per centum of aluminum and have silicon and iron as the other principal component elements.

If, as stated by plaintiff, the Alcan 6018 alloy is not silicon aluminum, hence not excluded from paragraph 374, and if the silicon aluminum of commerce is a mixture, rather than an alloy, as stated by some of the witnesses, then it would seem on that theory that none of the nonferrous silicon aluminums would be excluded from paragraph 374.

The appellate court, in the second *Tower* case (41 C. C. P. A. (Customs) 195, 200, C. A. D. 550), recognized the rule that—

* * * legislative history may not be resorted to when the language of tariff statutes is plain and unambiguous. When the language used in a statute is so ambiguous that it cannot be properly determined under which paragraph Congress meant merchandise to be classified, then resort to legislative history is proper. *Stoeger* v. *The United States*, 15 Ct. Cust. Appls. 291, T. D. 42472.

In conclusion, the court observed:

However, we have examined the legislative history with respect to the provisions of paragraph 302 (j) and find nothing therein indicative of the fact that the provisions thereof should be limited as contended by counsel for appellant. * * *

From a careful review of the record and the authorities to which reference has been made, we are satisfied that plaintiff has not supplied convincing proof that paragraph 302 (j) is restricted by use or any other qualification. We find and hold that the importation in controversy is, in fact, silicon aluminum, an alloy in chief value of

aluminum, which is excluded from the benefits of paragraph 374, as modified, *supra*, by the express exception therein.

The claim in the protest is, therefore, overruled, and judgment will issue accordingly.