(C. D. 1872)

C. J. TOWER & SONS *v.* UNITED STATES

United States Customs Court, Second Division

(Decided April 17, 1957)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Richard M. Kozinn* and *Henry J. O'Neill*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Merchandise, described in the invoices as 'Abrasive Furnace Ferro Silicon," was classified by the collector of

customs as "ferrosilicon containing 8 per centum or more of silicon and less than 30 per centum" of the kind made dutiable in paragraph 302 (i) of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 302 (i)), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, at the rate of 1 cent per pound on the silicon content.

By its protest, plaintiff claims that the merchandise is free of duty, pursuant to the terms of paragraph 1664 of said act (19 U. S. C. § 1201, par. 1664), and, by an amendment of the protest, it is alternatively claimed that the commodity is "Free of duty under Public Law 869, 81st Cong., as amended; or 4% Par. 1555, Tariff Act of 1930, as modified."

At the trial, the contention of plaintiff was more specifically set forth in the following terms:

The importer contends that the merchandise does not fall within the commercial meaning of the term, ferrosilicon, under the rules of commercial designation as enunciated by this Court, as that term was understood in the trade and commerce of the United States on and prior to June 17, 1930, and also on and prior to January 1, 1936 and January 1, 1939 and January 1, 1948, on each of which dates, trade agreements went into effect which contained the term ferrosilicon.

For convenience, paragraph 302 (i), as modified, *supra*, is here set out in full:

Ferrosilicon:

| | |
|---|---|
| Containing 8 per centum or more of silicon and less than 30 per centum. | 1¢ per lb. on the silicon contained therein |
| Containing 30 per centum or more of silicon and less than 60 per centum. | 1½¢ per lb. on the silicon contained therein |
| Containing 60 per centum or more of silicon and less than 80 per centum. | 2¢ per lb. on the silicon contained therein |
| Containing 80 per centum or more of silicon and less than 90 per centum. | 2½¢ per lb. on the silicon contained therein |
| Containing 90 per centum or more of silicon. | 4¢ per lb. on the silicon contained therein |

Paragraph 1664, *supra*, relied upon by plaintiff, reads as follows:

Metallic mineral substances in a crude state, such as drosses, skimmings, residues, brass foundry ash, and flue dust, not specially provided for.

Since the amended claims with reference to Public Law 869 and paragraph 1555 of the tariff act are not pressed or even referred to in argument, they are treated as having been abandoned.

At the trial, plaintiff introduced the testimony of five witnesses and the defendant called three.

Plaintiff's first witness, Arden Morris MacDonald, testified that, for the past 2 years, he had been the works manager for the Canadian Carborundum Co., Ltd., of Niagara Falls, Ontario, manufacturer and shipper of the subject merchandise. Prior to that time, he had been general superintendent of the company and previously had "worked on approximately every job in the plant," his entire experience covering a period of 20 years.

He stated that the business of the company was the production of crude abrasive aluminum oxide and bonded abrasive products and that he was thoroughly familiar with the manner in which the imported commodity is produced, describing it as follows:

In our furnace plant, we have an electric-furnace process for the manufacture of crude abrasive aluminum oxide. This aluminum oxide is manufactured primarily from bauxite ore which in a metal state is approximately 86 per cent to 88 per cent aluminum oxide in a non-crystalline form. It also has impurities in the form of oxides, silica, iron, and titanium. In the electri-furnace [sic] process, two things happen, one is that in the melting, we change the non-crystalline structure of the aluminum oxide found in the metal ore to a crystalline structure, the other is that we reduce the undesirable impurities, namely the oxides of silica and iron and we control production of the oxide and titanium. This is accomplished by adding primarily coke or carbon to the mix when charged to the furnace which frees the oxides of silica and iron and leaves free silicon and free iron which unite to form the by-product metal which of its weight settles out in the bottom of the furnace.

The witness further pointed out that—

Iron borings are also. added to the mix to make this resultant metal magnetic. The prime purpose of that is that when processing aluminum oxide into abrasive products, it is necessary to remove any form of metal from the crude abrasive, and this is done by magnetic means, and if not removed, the resultant abrasive products would be scrap.

It further appears from the testimony of MacDonald that the primary product produced. in the process above described is crude abrasive aluminum oxide, also known by the name of Aloxite, and that the "by-product metal," referred to by the witness, is the abrasive furnace ferrosilicon, represented by exhibits 1 and 2, which is the subject of this controversy.

Plaintiff's second witness, Arthur W. Dimond, also connected with the Canadian Carborundum Co., Ltd., of Niagara Falls, Ontario, testified that, for about 4 years, he had held the position of process engineer and, for about 3 years prior thereto, had been employed as an analytical chemist. Previous to that time, he had been in the employ of three other companies engaged in different lines of activity.

In his capacity as an analytical chemist and as process engineer with the Canadian Carborundum Co., he had become familiar with the ingredients and characteristics of its products. He had analyzed the two carload importations in controversy and found the silicon

content of car NYC–634321 to be 16.10 per centum and of car NYC–712931 to be 16.57 per centum; that the components in various shipments are as follows: Iron, 73 to 83 per centum; silicon, 11 to 20 per centum; aluminum, 0.3 to 4.5 per centum; titanium, 1 to 7 per centum; alumina, 0.5 to 3 per centum; carbon 0.1 to 1.0 per centum; phosphorous and manganese, traces.

Plaintiff's third witness, Clay P. Hellwig, testified that he had been connected with the Kerchner-Marshall Co. and other allied companies for a period of 38 years as American sales agent.

He stated that the term "ferrosilicon," as sold to foundries and steel plants, has reference to "a primary product made under definite specifications in a blast furnace and in a pig-iron form originally, it was a pig-iron"; that the term "ferrosilicon," as understood in the trade, would not include abrasive furnace ferrosilicon.

Plaintiff's fourth witness, George B. Michie, was vice president of the Electro-Refractories and Abrasive Corp., which is engaged in the manufacture of crucibles, refractories, grinding wheels, abrasive wheels, and carbon grain. He had been with that company since December 1930 and, prior to that time—from 1923 to 1926—he was connected with the metallurgical department of the International Motor Co. From 1927 to 1928, he was in charge of the manufacture of nonferrous alloys for Alloys Products and, from 1927 to 1930, was Midwest representative in a sales capacity with the Niagara Falls Smelting and Refining Corp. in the States of Illinois, Indiana, Mississippi, Wisconsin, and Minnesota.

His company began the manufacture of nonferrous alloys in 1930 and discontinued their manufacture and sale in 1950. During his association with the International Motor Co. and the Niagara Falls Smelting and Refining Corp., he was not only manufacturing, but purchasing, both silicon metal and ferrosilicon, his purchases being from the Electro-Metallurgical Co.

When interrogated as to the meaning of the term "ferrosilicon," as employed in trade and commerce, he replied:

Well, ferrosilicon has various compositions, if we ordered 50/50 ferrosilicon, that is what we expected to get within the specifications set up, but a company like the Electro-Metallurgical Company—that is a long time ago—but the silicon variation might have been 48/52, it is all within their literature.

Further, he stated:

My recollection was that it was a commercially compounded alloy of iron and silicon, an electric furnace product as produced by the two companies stated—those were the only two that I knew at that time.

Along this line, Michie stated:

If we ordered 25/75, that is what we expected to get, within the specifications which we set up for that particular grade.

\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*

Twenty-five per cent iron and seventy-five per cent silicon or the reverse— they had both, I believe, it is a long time ago.

So, it would seem that 25 per centum was the lowest silicon content of ferrosilicon with which he was familiar.

Plaintiff's fifth witness, Julian A. Phelps, was also connected as a salesman with the Kerchner-Marshall Co. since 1950 and as a foundry engineer and salesman for the Vanadium Corp. of America from 1947 to 1950. Prior to that time, in 1942, he was employed by the Vanadium Corp. as a metallurgist and department foreman. From 1935 to 1941, he acted as foundry foreman for other companies.

Phelps testified that the term "ferrosilicon" had a uniform and definite meaning in the trade with which he dealt on and prior to October 14, 1947, and, when asked to give a meaning of the term, stated that "To my mind, it was a purposely produced alloy containing iron and silicon with a further limitation that the silicon was of a specified amount and the other elements were in the minimum amounts" and that the subject merchandise "would be excluded from my terminology and the accepted terminology as I understood it as ferrosilicon," adding "Because the other extraneous elements which exist in it to a rather large degree."

The evident purpose of the testimony of Hellwig, Michie, and Phelps was to establish a uniform, definite, and general meaning of the term "ferrosilicon" at and prior to the passage of the Tariff Act of June 17, 1930, and certain trade agreements entered into in 1947 and 1948, which was limited in its scope to a purposely produced alloy containing iron and silicon, the silicon being of a specified amount.

Defendant's first witness was Jerome Strauss, vice president of the Vanadium Corp. since 1935, who was engaged primarily with the technical problems of the company. Previously, he had held positions with the United States Naval Gun Foundry in the chemical and metallurgical laboratories for 9 years. For 2 years, he was in the Army, engaged in metallurgical inspection, and, before that, for $1\frac{1}{2}$ years, was in charge of the metallurgical and chemical departments of the Western Drop Forge Co. and the United States Steel Co.

When asked if the Vanadium Corp. produced ferrosilicon "within the grade of approximately 16.10 per cent to 16.57 per cent," Strauss replied:

Well, that is a commercial situation, I will answer briefly—the price of steel scrap is high—and 16 per cent or 15 per cent silicon are made in the blast furnace. The electrical furnace cannot compete with that, and we operate the blast furnace and when the price of steel scrap is low, we can make 15 per cent ferrosilicon and have done so.

Strauss testified that, at the present time, his company was producing ferrosilicon, containing silicon in the following percentages: 22 to

60 per centum; 25 to 65 per centum; 75 to 85 per centum; and 90 to 95 per centum.

Strauss stated that the merchandise, represented by exhibits 1 and 2 herein, was recognized by him as ferrosilicon; that the silicon content determines the price; that the method of manufacture of ferrosilicon is a matter of no consequence so far as nomenclature is concerned because "having a wide variety of uses, the silicon content is of primary importance."

Strauss also testified that there are three classes of ferrosilicon, "16 per cent, 22 per cent, and twenty-five per cent, made to contain primarily iron and silica which are used for exactly the same purposes in the steel industry in the blocking of open hearth steel in exactly the same manner that this S. A. T. alloy is used," referring to exhibits 1 and 2. One of the witnesses indicated that the initials "S. A. T." mean "silicon, aluminum, and titanium."

Defendant's second witness, John H. Spillane, testified that he was vice president for 9 years of the United States Vanadium Co. and Electro-Metallurgical Co., both divisions of the Union Carbide and Carbon Corp., the United States Vanadium Co. being responsible for the sales and service of vanadium, tungsten, and uranium, while the Electro-Metallurgical Co. has to do with the sales of ferro alloys, including ferrosilicon; that his company produces ferrosilicon as a prime product and also as a byproduct in the production of other materials; that calcium carbide is one product of which it is a byproduct. Since 1936, Spillane had been with the Electro-Metallurgical Co. in the Sales and Service Department on the Pacific coast and division manager in Chicago. Prior to 1936, he was with the American Manganese Steel Division of the American Brake Shoe and Foundry Co., performing metallurgical duties and in charge of smelting.

Between the years 1924 to 1936, this witness was familiar with the manufacture of steel products, in which ferrosilicon was utilized, and stated that a ferrosilicon with a content of 16.10 to 16.57 per centum silicon, obtained by the method herein described, would be used when conditions warranted for the purpose of dioxidation of steel, and that ferrosilicon resulting as a byproduct in the production of calcium carbide had been used in the iron and steel business as a reducing agent. Spillane also testified to his familiarity with prime ferrosilicon, which is produced with a definite control over the ferrosilicon content.

The last witness for defendant, James W. Polk, customs agent in charge of the Customs Agency Service at Buffalo, N. Y., was called for the purpose of identifying certain documents, which were not received in evidence but were marked "Defendant's Exhibits 'A' and 'B' for Identification," respectively.

The foregoing does not purport to be an exhaustive treatment of the testimonial record, but it is deemed sufficient for the purposes of this opinion.

While it is not disputed that the silicon contents of the two carload importations of abrasive furnace ferrosilicon in controversy are as determined by the collector of customs, namely, 16.10 and 16.57 per centum, respectively, nevertheless, plaintiff contends that, perforce the rule of commercial designation, byproduct ferrosilicon is not within the commercial meaning of the term "ferrosilicon," as employed in paragraph 302 (i), *supra*. Stated another way, it is claimed by plaintiff that the ferrosilicon of the various grades enumerated in said paragraph 302 (i) is limited to those products when purposely produced by controlled processes. There is no competent proof, however, that low-grade ferrosilicon with a silicon content of 8 to approximately 16 per centum is produced by controlled processes.

For reasons which will presently appear, it is our considered opinion that paragraph 302 (i) is not properly susceptible to the interpretation urged by plaintiff; that, even if commercial designation were established, as contended by plaintiff, which we do not decide, this is another of those cases in which the intent of the Congress is expressed in terms which do not permit of the ascertainment of their meaning by resort to commercial designation.

The context, the legislative and judicial history of the statute with which we are dealing, together with an examination of statutes in *pari materia*, strongly point the way to a determination of the issue presented herein.

In a recent case, *C. J. Tower & Sons v. United States*, 37 Cust. Ct. 212, C. D. 1826 (presently on appeal, suit 4910), we held that an imported commodity in the form of ingots, known as "Alcan 6018 alloy," composed of aluminum and silicon in relative percentages of approximately 88 per centum of aluminum and 12 per centum of silicon, was properly classified as aluminum silicon, pursuant to the provisions of paragraph 302 (j) of said act, of the kind made dutiable therein at 5 cents per pound.

It will be noted that said paragraph 302 (j) provides for:

Silicon aluminum, aluminum silicon, alsimin, ferrosilicon aluminum, and ferroaluminum silicon, 5 cents per pound.

By Presidential proclamation, 61 Treas. Dec. 1306, T. D. 45762, the duty upon alsimin, ferrosilicon aluminum, and ferroaluminum silicon, "containing 20 but not more than 52 per centum of aluminum, and having silicon and iron as the other principal component elements," was reduced from 5 cents per pound to 2½ cents per pound. In a later trade agreement, 69 Treas. Dec. 74, T. D. 48093, the rate on those items was further reduced, with the same limitations as to the

percentages of aluminum and the presence of the other component elements. In neither the proclamation nor the trade agreement, however, was any reference made to aluminum silicon or silicon aluminum.

In that case, it was contended by the plaintiff therein that the provision for aluminum silicon was limited, in a commercial sense, to those alloys of aluminum and silicon in percentages of 75 and 25 or 50 and 50, respectively, and, furthermore, that the classification of the article depended upon the use to which the commodity was put.

We there held that the language of paragraph 302 (j), when interpreted in accordance with the natural and popular signification of the words, was clear and unambiguous and disclosed that the provision for aluminum silicon was not restricted by use or any other qualification—following *C. J. Tower & Sons* v. *United States*, 41 C. C. P. A. (Customs) 195, C. A. D. 550, which affirmed the opinion of this court in *id.* v. *id.*, 30 Cust. Ct. 72, C. D. 1498.

We are of the considered opinion that the context of paragraph 302 (i), read in the light of its judicial and legislative history, leads us to the same conclusion here. As indicated earlier in this opinion, paragraph 302 (i) provides for ferrosilicon, containing 8 per centum or more of silicon and less than 30 per centum; containing 30 per centum or more of silicon and less than 60 per centum; containing 60 per centum or more of silicon and less than 80 per centum; containing 80 per centum or more of silicon and less than 90 per centum; and containing 90 per centum or more of silicon, all on a sliding scale of rates of duty.

The language employed by the Congress, above referred to, leads unerringly to the conclusion that the Congress was concerned only with ferrosilicon, having the minimum and maximum amounts of silicon above indicated, regardless of the method of its production or the use for which it was employed.

It will be recalled that, many years ago, our appellate court held that a low-grade ferrosilicon, originating as a byproduct in the manufacture of aluminous abrasives which was chiefly used in the manufacture of ordinary basic steel, was properly classifiable as ferrosilicon used in the manufacture of steel in paragraph 102 of the Tariff Act of 1913, notwithstanding the fact that there was a much higher grade of ferrosilicon made to specifications and better adapted to the making of steel. *United States* v. *Tower & Sons et al.*, 10 Ct. Cust. Appls. 155, T. D. 38401.

. In its opinion in that case, the court referred to testimony disclosing the method of producing the merchandise there before it as a byproduct in the production of crude aluminous abrasives; to the differences in the various contents of low-grade ferrosilicon as compared to high-grade ferrosilicon; to the wide disparity in the prices of the two grades of ferrosilicon; to the fact that, whereas manu-

facturers of high-grade steel could not use low-grade ferrosilicon, the latter could be used in the manufacture of ordinary basic steel.

In the course of its opinion, the court observed:

The testimony of importers' witnesses was limited to a comparison of the components of the importation with those of electrolytic and Bessemer ferrosilicon, both of them high-grade products made to specifications and carefully analyzed; that testimony establishes nothing more than that the importation is not standard or high-grade ferrosilicon. On the other hand, the evidence submitted by the Government proves substantially without contradiction that the importation is at least a low-grade ferrosilicon. Low grade as it may be, however, it is nevertheless ferrosilicon, and as it is bought and sold as such in wholsesale quantities by the trade and is chiefly used in the manufacture of ordinary basic steel, it certainly comes within the Tariff designation "ferrosilicon used in the manufacture of steel."

It appears further from the opinion of the court that most of the importations, in that case, contained from 13 to nearly 17 per centum silicon. However, in the instant case, the silicon content is 16.10 and 16.57. The opinion of the appellate court, in that case, further recites that—

* * * to say that the statute contemplated only a ferrosilicon containing from 25 to 50 per cent of ferrosilicon [sic], ignores the fact that paragraph 184 of the tariff act of 1909 provided for ferrosilicon containing *not more than* 15 per cent of silicon as well as for ferrosilicon containing more than that percentage and that under that paragraph the commodity under consideration, whatever its use, could scarcely have escaped classification as ferrosilicon. * * *

The court then concluded that phase of the case by pointing out that—

* * * Paragraph 102 of the tariff act of 1913, it is true, differs from paragraph 184 of the act of 1909 inasmuch as it does not provide for two classes of ferrosilicon, but for such ferrosilicon only as is used in the manufacture of steel. Nevertheless, while the later provision may exclude ferrosilicon, which because of a high phosphorus, sulphur, aluminum, titanium, or other content, can not be used for the making of steel, it can hardly be contended that it excludes a ferrosilicon which is actually used for the manufacturing purpose specified.

The "purpose specified," as above indicated, was the "manufacture of ordinary basic steel."

It is significant that, in the Tariff Act of 1922, paragraph 302, which enumerated various alloys, provided for ferrosilicon, containing 8 per centum or more of silicon and less than 60 per centum, containing 60 per centum or more and less than 80 per centum, containing 80 per centum or more and less than 90 per centum, and containing 90 per centum or more of silicon, on a sliding scale of rates of duty. The same statutory provisions were carried over into paragraph 302 (i) of the Tariff Act of 1930, as modified, *supra*, with the exception that the present law provides for ferrosilicon, containing 8 per centum or more of silicon and less than 30 per centum, and for ferrosilicon, containing 30 per centum or more of silicon and less than 60 per centum, the

other specifications up to and including that containing 90 per centum or more of silicon being the same.

The language of the statutes prior to and since the Tariff Act of 1913 (paragraph 102), makes it crystal clear that Congress intended to provide for all grades of ferrosilicon, regardless of the method of production, whether according to specifications by controlled processes or appearing as a byproduct in the manufacture of aluminum abrasives, and, furthermore, it appears to be a matter of no consequence whether ferrosilicon is employed in the manufacture of basic steel or a high-grade steel.

*United States* v. *Tower & Sons et al., supra,* was decided by the appellate court on May 1, 1920. Congress is charged with knowledge of that decision when it drafted paragraph 302 of the Tariff Act of 1922 and paragraph 302 (i) of the Tariff Act of 1930, in both of which statutes provision was made for various grades of ferrosilicon, containing a minimum silicon content of 8 per centum and a maximum of 90 or more per centum. These circumstances point strongly to legislative approval of judicial interpretation. *United States* v. *Kawahara,* 15 Ct. Cust. Appls. 231, T. D. 42242.

Before concluding this opinion, reference is made to a motion of defendant—objected to by plaintiff—to incorporate herein the record in *United States* v. *Tower & Sons et al., supra.* The trial judge reserved ruling on the motion for action by this division. The record in that case was made nearly 40 years ago. Different counsel appeared therein. The issues were slightly different although, from a description of the commodity, the merchandise in the two cases is substantially the same. Furthermore, it is unlikely that any of the witnesses who testified in the former case could be recalled, if requested for further examination by counsel. In the circumstances, we sustain plaintiff's objection to incorporation and deny the motion of defendant.

Plaintiff, in its brief, contends "that the product involved in this case is the same in principle as the abrasive sludge which was before the court in *C. J. Tower & Sons* v. *United States,* 26 Cust. Ct. 284, C. D. 1337, which was affirmed in *United States* v. *C. J. Tower & Sons* [40 C. C. P. A. (Customs) 14], C. A. D. 491."

It appears from the opinion of the appellate court that an importation, described as "Abrasive Sludge 81," was classified by the collector of customs as "Ferrosilicon, containing 8 per centum or more of silicon and less than 30 per centum," pursuant to the provisions of paragraph 302 (i) of the Tariff Act of 1930, as modified.

It is noted further in the opinion of the court that, at the trial, the Government conceded that the merchandise had been improperly classified by the collector in subparagraph (i), but contended that the product was properly dutiable in paragraph 302 (o) of said act, which provides for "All alloys used in the manufacture of steel or iron, not

specially provided for." The court held, upon the record before it, that commercial designation of the term "alloys" had been aptly proved by well-qualified witnesses and that such designation differed from the common meaning of the term. Accordingly, that court affirmed the judgment of this court in holding that the term "alloys," as used in paragraph 302 (o), *supra*, "signifies an intimate and uniform mixture of two or more metals or metals and nonmetals definitely manufactured to rigid specifications."

In view of the issue as drawn in that case, we do not consider that it has any controlling effect here.

With reference to the claim that the commodity should be classified in the free list paragraph 1664, which provides for certain metallic mineral substances in a crude state, "not specially provided for," we are of the opinion that, even if the imported commodity here in controversy could be regarded as of the class of merchandise enumerated in said paragraph 1664, it is elsewhere more specially provided for in paragraph 302 (i).

On the record as made and for the foregoing reasons, we find and hold that the subject merchandise is, in truth, in substance, and in fact, ferrosilicon, containing 8 per centum or more of silicon and less than 30 per centum, of the kind made dutiable in paragraph 302 (i) at the rate of 1 cent per pound on the silicon contained therein, as classified and assessed by the collector of customs.

We regard the claims of the plaintiff without merit and overrule the protest on all grounds.

Judgment will issue accordingly.