UNITED STATES v. FAUNCE *et al.* (No. 1740).[1]

TANT IRON—"IRON IN PIGS"—FERROSILICON.

Iron in the form of pigs, known by the proprietary name "tant iron," having a silicon content greater than that of ordinary pig iron but much less than that of ordinary ferrosilicon and manganese and sulphur contents greater than those of ferrosilicon, used for casting and machining into bowls to contain acids, shown to be unfit for use like ferrosilicon as an alloy in the manufacture of steel, is but a special kind of pig iron, and is dutiable as "iron in pigs" (par. 518, tariff act of 1913). It is not ferrosilicon, and is not dutiable as such under paragraph 102, or as "unwrought metal" under paragraph 154.

United States Court of Customs Appeals, January 22, 1917.

APPEAL from Board of United States General Appraisers, G. A. 7916 (T. D. 36452).
[Affirmed.]

*Bert Hanson*, Assistant Attorney General (*Thomas J. Doherty*, special attorney, of counsel), for the United States.
*Comstock & Washburn* (*Albert H. Washburn* and *J. Stuart Tompkins* of counsel) for appellants.

[Oral argument Dec. 8, 1916, by Mr. Hanson, Mr. Washburn, and Mr. Tompkins.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MARTIN, Judge, delivered the opinion of the court:

The merchandise in this case is a certain kind of metal imported in the form of pigs. The collector classified it as ferrosilicon, and accordingly assessed duty at the rate of 15 per cent ad valorem under paragraph 102 of the tariff act of 1913.

The importers protested, claiming that the merchandise was "iron in pigs," and entitled to free entry as such under paragraph 518 of the act, or alternatively that it should be assessed with duty at the

---

[1] Reported in T. D. 36984 (32 Treas. Dec., 140).

rate of 10 per cent ad valorem as "unwrought" metal under paragraph 154.

The protest was submitted upon evidence to the Board of General Appraisers, and was sustained. The board found from the evidence that the merchandise was not ferrosilicon, but was iron in pigs, and held that it was entitled to free entry, as claimed by the importers. The Government now appeals from that decision.

The following is a copy of the paragraphs just cited:

102. Chrome or chromium metal, ferrochrome or ferrochromium, ferromolybdenum, ferrophosphorus, ferrotitanium, ferrotungsten, ferrovanadium, molybdenum, titanium, tantalum, tungsten or wolfram metal, and ferrosilicon, and other alloys used in the manufacture of steel, not specially provided for in this section, 15 per centum ad valorem.

154. Metallic mineral substances in a crude state, and metals unwrought, whether capable of being wrought or not, not specially provided for in this section, 10 per centum ad valorem; monazite sand and thorite; thorium, oxide of and salts of; gas, kerosene, or alcohol mantles treated with chemicals or metallic oxides, 25 per centum ad valorem; and gas-mantle scrap consisting in chief value of metallic oxides, 10 per centum ad valorem.

518. Iron ore, including manganiferous iron ore, and the dross or residuum from burnt pyrites; iron in pigs, iron kentledge, spiegeleisen, wrought iron and scrap and scrap steel; but nothing shall be deemed scrap iron or scrap steel except second-hand or waste or refuse iron or steel fit only to be remanufactured; ferromanganese; iron in slabs, blooms, loops or other forms less finished than iron bars, and more advanced than pig iron, except castings, not specially provided for in this section.

It appears from the record that the imported merchandise is a kind of iron having a high silicon content, known by the proprietary name of tant iron. It is imported in the form of pigs measuring about 20 inches in length, about 4 inches in thickness, and weighing about 125 pounds each. In use it is melted in a furnace like pig iron and cast in sand molds into the form of bowls. These are finished by machining processes and are used as containers in the manufacture of nitric and sulphuric acids and other chemicals, the metal possessing great resistant power as against these substances.

The question before us is whether the present record sufficiently sustains the finding of the board that the merchandise was not ferrosilicon but was iron in pigs.

Four witnesses appeared before the board. These were Mr. Lehman, who is general manager of the Bethlehem Foundry & Machine Co., being the real importer in the case; Mr. Ettle, who is the chemist of that company; Mr. Wyser, who is the chemist of the Bethlehem Steel Co.; and Mr. Sullivan, who is resident manager of Rogers Brown & Co., a domestic company which annually handles from 30 to 40 thousand tons of ferrosilicon and from 2,000,000 to 3,000,000 tons of pig iron.

These witnesses without exception testified that the present merchandise of which samples and analyses were produced was not

ferrosilicon, but was a special kind of pig iron. These statements were explained in detail by the witnesses under a careful examination by counsel and the board based its findings upon them.

It is impracticable to recite all of the testimony of the several witnesses, but the following is the substance of it:

Ferrosilicon and common pig iron differ from each other in several essential particulars. First in respect to use: Ferrosilicon, consistently with the residuary clause for "other alloys used in the manufacture of steel," in paragraph 102, *supra*, is an alloy which is exclusively used in the manufacture of steel. In the open-hearth process of making steel ferrosilicon is added to the steel in small quantities as a means of imparting silicon to the product. In this process the ferrosilicon is entirely absorbed. The metal is highly brittle, and consequently incapable of machining. Because of this fact it is never melted by itself under any conditions, since it could not be finished by machining into manufactured articles. It is well known on the other hand that common pig iron is capable of machining, and that it is largely used for castings which are finished by that means into manufactured articles. Ferrosilicon, therefore, is incapable of the uses of common pig iron, and on the other hand pig iron can not be used like ferrosilicon as an alloy in the making of steel.

In respect to chemical composition also ferrosilicon and common pig iron show inportant points of disagreement. Each is composed of six elements, viz, iron, silicon, manganese, sulphur, phosphorus, and graphitic carbon, but these appear in radically different proportions in the several substances. Ferrosilicon may contain as little as 20 per cent of iron and as much as 80 per cent of silicon, while pig iron never contains less than 80 per cent of iron and rarely more than 15 or 16 per cent of silicon. Common pig iron contains ordinarily from 2 to 4 per cent of silicon, while that kind of ferrosilicon which is most commonly used contains from 48 to 52 per cent of silicon. The proportions of phosphorus, sulphur, and carbon contained in ferrosilicon are negligible, being notably less than those in pig iron, and the difference in the manganese content is very marked. Ferrosilicon contains no more than from 0.2 to 0.25 of manganese, whereas pig iron contains a much greater percentage of manganese, running by specifications as high as 8 or 9 per cent. This latter difference has a controlling influence over the character and use of the respective articles, since it is the absence of manganese from ferrosilicon which renders that substance brittle and incapable of machining.

The foregoing differences between ferrosilicon and pig iron are clearly defined and well sustained by all the testimony. The question thereupon arises as to which of the two classifications includes the present articles.

As has been said, this merchandise bears the proprietary name of tant iron. It is used exclusively in this country like pig iron in that it is melted alone in a cupola and cast in sand molds into bowls, which are then machined like pig-iron castings. The metal can not be used like ferrosilicon as an alloy in the making of steel, because of its considerable manganese and sulphur contents. In the important particular of use, therefore, the article is clearly classifiable as a species of pig iron rather than as a ferrosilicon. The witnesses also say that tant iron has the appearance of gray iron, whereas ferrosilicon has a crystalline appearance.

In respect to chemical composition it appears that the imported metal, like common pig iron, contains a greater proportion of phosphorus, sulphur, and carbon than ferrosilicon. These elements, however, are not so important as is the ingredient manganese. In respect to this element the present merchandise is again classifiable as a pig iron, since it contains upon an average $2\frac{1}{3}$ per cent of manganese, this being about 10 times as great a proportion of manganese as appears in ferrosilicon. Its capability for machining is said to be due to this fact. It is said also that this quality increases the cost of production of tant iron as compared with low-grade ferrosilicon.

In respect to silicon it is true that the present article contains an unusually high percentage of that element as compared with common or average pig iron, to wit, about 14 per cent of the total content thereof, whereas average pig iron commonly contains 4 per cent or less of silicon. It is this high silicon content of tant iron which gives it its valuable quality of resistance in the presence of nitric, sulphuric, and like acids. The testimony, however, discloses without contradiction that while common pig iron contains upon the average only about 4 per cent of silicon or less, nevertheless there are special kinds of pig iron known to the trade which contain as high as 15 or 16 per cent of that element. The witnesses agree that in the trade pig iron is almost invariably bought upon express specifications of the relative proportions of silicon, manganese, sulphur, phosphorus, and carbon to be contained therein, and that iron in pigs containing a silicon content of 15 per cent, other elements allowing, would simply be a special order of pig iron.

Upon the testimony, thus briefly outlined, the board found that the imported merchandise was pig iron, and sustained the importers' claim of free entry under paragraph 518, *supra*. We agree with this finding, for, according to the evidence aforesaid, the metal in question is not ferrosilicon, but essentially differs therefrom in character and use, and it is classifiable as pig iron even though it differs to some extent from the average pig iron of commerce in respect to the proportion of silicon contained therein.

The decision of the board is therefore *affirmed*.