UNITED STATES *v.* TOWER & SONS ET AL. (No. 2023).[1]

CONSTRUCTION, PARAGRAPH 102, TARIFF ACT OF 1913, AIDED BY TARIFF HISTORY—
"FERROSILICON."

   Low grade ferrosilicon, originated as a by-product in the manufacture of aluminous abrasives, known commercially as ferrosilicon and chiefly used in the manufacture of ordinary basic steel, is classifiable as "ferrosilicon" under paragraph 102, tariff act of 1913, notwithstanding that there is a much higher grade, made to specifications and better adapted to the making of steel.—United States *v.* Faunce et al (7 Ct. Cust. Appls., 426; T. D. 36984) distinguished. To exclude the merchandise

[1] T. D. 38401 (38 Treas. Dec., 409).

from this paragraph because its silicon content is as low as from 13 to nearly 17 per cent, whereas that of standard ferrosilicon is much higher, would be to ignore the fact that the parent paragraph (184, act of 1909) provided for ferrosilicon containing not more than 15 per cent of silicon as well as for that containing more. The merchandise is not classifiable as "iron ore," "iron in pigs" or " scrap and scrap steel" under paragraph 518; as crude minerals under paragraph 649; as crude metallic mineral substances or metals unwrought under paragraph 154; as waste under paragraph 384; or as nonenumerated unmanufactured articles under paragraph 385.

### United States Court of Customs Appeals, May 1, 1920.

APPEAL from Board of United States General Appraisers, G. A. 8306 (T. D. 38190).

[Reversed.]

*Bert Hanson*, Assistant Attorney General (*Martin T. Baldwin*, special attorney, of counsel), for the United States.
*Comstock & Washburn* (*J. Stuart Tompkins* of counsel) for appellees.

[Oral argument Mar. 26, 1920, by Mr. Baldwin and Mr. Tompkins.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

SMITH, Judge, delivered the opinion of the court:

Certain metallic material imported at the port of Buffalo, N. Y., was classified by the collector as ferrosilicon and assessed for duty at the rate of 15 per cent ad valorem under that part of paragraph 102 of the tariff act of October 3, 1913, which reads as follows:

102. Chrome  *  *  *  ferrophosphorus, ferrotitanium  *  *  *  ferrosilicon, and other alloys used in the manufacture of steel, not specially provided for in this section, 15 per centum ad valorem.

The importers protested that the merchandise was not dutiable as ferrosilicon or otherwise at 15 per cent ad valorem under paragraph 102, and that it was either free of duty as scrap iron or scrap steel or as iron in pigs, or as one of the other commodities provided for in paragraph 518, or if not free of duty under paragraph 518, it was free of duty under paragraph 549 as minerals, crude, or not advanced in value or condition. It was further claimed in the protest that if dutiable the merchandise was dutiable at only 10 per cent ad valorem as a metallic mineral substance in a crude state or as metals unwrought under paragraph 154, or as waste under paragraph 384, or as a nonenumerated raw or unmanufactured article under paragraph 385.

The pertinent parts of the paragraphs upon which the importers relied in their protests were as follows:

#### FREE LIST.

That on and after the day following the passage of this act  *  *  *  the articles mentioned in the following paragraphs shall, when imported into the United States  *  *  *  be exempt from duty.

518. Iron ore,  *  *  *  iron in pigs  *  *  *  scrap and scrap steel  *  *  *.

649. Minerals, crude, or not advanced in value or condition by refining or grinding, or by other process of manufacture, not specially provided for in this section.

DUTY PARAGRAPHS.

154. Metallic mineral substances in a crude state, and metals unwrought, whether capable of being wrought or not, not specially provided for in this section, 10 per centum ad valorem.

384. Waste, not specially provided for in this section, 10 per centum ad valorem.

385. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for in this section, a duty of of 10 per centum ad valorem * * *.

The Board of General Appraisers sustained the protest, and the Government appealed.

On the hearing before the board, M. O. Lamar, testified on behalf of the importers, that he was chief chemist for Norton & Co., manufacturers of aluminous abrasives, at Niagara Falls, N. Y., and Chippewa, Ontario; that the merchandise was a product which collects at the bottom of the furnaces after the production of the crude aluminous abrasive; that he had no knowledge of the use to which the material so deposited was put; that the sulphur content of the commercial grade of ferrosilicon was about four one-hundredths of a per cent; that the sulphur content of the importation was about three times that amount or twelve one-hundredths per cent; that the phosphorus content of commercial ferrosilicon was generally four one-hundredths per cent; that the phosphorus content of the importation was nearer six-tenths of 1 per cent; that alumina and titanium are almost entirely absent from commercial ferrosilicon, whereas it was present in the material imported to the extent of $3\frac{1}{2}$ per cent; that commercial ferrosilicon sells at $155 to $190 a ton, and the material imported was worth about $30 a ton; that the ferrosilicon which was generally sold contained from 50 to 90 per cent of silicon, and that the material imported did not average more than 16 per cent; that commercial ferrosilicon was used in the manufacture of steel, and that the material imported, on account of its high phosphorus and high sulphur content, was unsuited for such use; that ferrosilicon is manufactured according to definite specifications, and that the material imported was produced without specifications as a waste.

This witness made an analysis of the importation from which it appeared that the material of one carload contained 8.80 per cent of silicon, and that another carload contained 9.91 per cent; that the material in four cars contained more than 10 per cent of silicon; the material in three cars more than 11 per cent of silicon, the material in three cars more than 13 per cent of silicon, the material in four cars more than 14 per cent of silicon, the material in three cars more than 15 per cent of silicon, and the material of one car 16.85 per cent of silicon.

N. A. Wilson, called by the importers, testified that he was operating superintendent for the Norton Co., manufacturers of crude

artificial abrasives; that merchandise like that in question prior to the war was sold to scrap dealers in Niagara Falls and Buffalo for the manufacture of window-sash weights and such things as that; that it had no other commercial value so far as he could determine; that since the war it was sold by the company to a broker who in turn disposed of it to steel manufacturers. Prior to the war it was not accepted by the broker on account of its quality; that the company could not sell the same to the steel manufacturers of Canada on account of its high phosphorus content; that the company used it to the extent of 300 tons for "filling-in purposes"; that he was not familiar with ferrosilicon; that any knowledge he had concerning ferrosilicon was derived from technical journals; that the published value of 50 per.cent ferrosilicon is from $100 to $170 per ton; that material like that imported sold at about $16 a ton on the average; that he could not say whether it was suitable for the uses to which ferrosilicon is generally applied; that the importation was invoiced by his firm according to the silicon content.

O. Hutchins, on behalf of the importers, testified that he was chemical engineer for the Carborundum Co., manufacturers of artificial abrasives, Niagara Falls, N. Y.; that the merchandise imported is a waste electric furnace product, consisting of iron, silicon, titanium and aluminum, mainly, and also of sulphur and phosphorus in considerable quantities; that the material was sold to scrap iron dealers and metal brokers; that he did not know what it was used for; that the sulphur content of the 50 per cent or higher variety of ferrosilicon is generally four hundredths of a per cent, whereas sulphur in the merchandise in question varies from five hundredths to nineteen hundredths per cent; that he would say that nineteen hundredths per cent of sulphur would prohibit the use of any material as ferrosilicon, and that such a percentage would be detrimental; that the phosphorus content in ferrosilicon generally runs about five hundredths per cent, whereas in some of the importations it runs as high as twenty times that amount; that aluminum in ferrosilicon runs from 1 to 2 per cent, and in the material imported as high as 10 per cent; that ferrosilicon contains from 2 to 3 tenths of a per cent of titanium, as compared with 12 per cent in the importation; that ferrosilicon is made according to definite requirements and specifications; that the importation was a waste product and that there was nothing standard about it; that phosphorus, iron, titanium, and aluminum vary greatly according to the ore used in making abrasives.

On the part of the Government, Humphry Davy Bond testified that he was a member of Vivian Bond & Co.; that he had been buying and selling ferrosilicon for a period of 13 years prior to May 16, 1919;

that for about six years prior to May 15, 1919, his firm had, in his opinion, purchased at least 90 per cent of the by-product ferrosilicon produced by the Carborundum Co. and the Norton Co.; that 12 carloads of the merchandise in question were bought from those companies by his company; that the purchase of this class of material began in 1900; that for material of the kind imported his firm paid as low as $10.50 a ton and as high as $40 a ton duty paid; that the ferrosilicon, in which his company deals, varies in its content and varies in that particular more than standard ferrosilicon; that the material imported is bought and sold at wholesale as ferrosilicon, although it was originally described as scrap iron; that the material obtained from the Carborundum Co. has always been described as ferrosilicon, but that that purchased from the Norton Co. was not so described until 1913; that during all the time that he has been familiar with the term ferrosilicon it had a definite, uniform, and general trade meaning, which would include the merchandise imported; that generally speaking an alloy of iron and silicon containing more than 9 per cent or 8 per cent silicon was described as ferrosilicon; that in the higher grades of ferrosilicon the phosphorus and sulphur should be very low; that the phosphorus in by-product ferrosilicon is somewhat higher than in regular 25 or 50 per cent ferrosilicon; that is to say, in ferrosilicon containing 25 or 50 per cent silicon; that he sold merchandise such as that imported to steel manufacturers and in some instances to certain manufacturers of cast iron, but principally to steel manufacturers; that the commodity is used in the ladle and in the open-hearth furnace, and is mixed with steel for the purpose of eliminating the gases and in some instances for the purpose of adding silicon to the steel; that manufacturers of high-grade steel could not use the alloy in which he deals, but that it can be used by manufacturers of ordinary basic steel; that so far as he knew by-product ferrosilicon was used for no purpose other than the manufacture of iron and steel; that the price which he obtains from the manufacturer is based on the silicon content.   On cross-examination the witness said that for a number of years most of Vivian Bond & Co.'s contracts with the Norton Co. covered that company's entire output of by-product ferrosilicon; that the price of $40 per ton paid during the war for by-product ferrosilicon was abnormally high; that the specifications for electrolytic ferrosilicon limit phosphorus to four or five one-hundredths of 1 per cent, and that Bessemer ferrosilicon would run a little higher; that from the point of view of the manufacturers the product sold to him might have been regarded as slag or waste, but that his company always sold it as ferrosilicon; that electrolytic ferrosilicon sold as high as $250 a ton during the war; that Bessemer ferrosilicon, the next grade, sold as high as $80 a ton,

and that this commodity sold at $40 a ton; that Bessemer ferrosilicon is now selling at about $40 a ton; and that since the armistice he has made no sales of by-product ferrosilicon. On redirect examination he stated that the trade designates the material in issue as "ferrosilicon" because it would be difficult to describe it as anything else.

Ramon E. Ozjas testified for the United States that he was assayer in the United States laboratory at the port of New York; that he made an assay of the merchandise imported and that he found it to be ferrosilicon as described in the report; that the composition of the material was not inconsistent with low-grade ferrosilicon; that ferrosilicon should contain probably not less than 8 per cent of silicon; that ferrosilicon is added to steel to purge it of gases and bring about the production of sound ingots. On cross-examination the witness stated that scrap iron contains a very small amount of silicon, a small amount of carbon, phosphorus, and sulphur, sometimes a small amount of manganese, but no such quantity as 8, 10, 13, or 15 per cent of silicon.

The testimony of importers' witnesses was limited to a comparison of the components of the importation with those of electrolytic and Bessemer ferrosilicon, both of them high-grade products made to specifications and carefully analyzed; that testimony establishes nothing more than that the importation is not standard or high-grade ferrosilicon. On the other hand, the evidence submitted by the Government proves substantially without contradiction that the importation is at least a low-grade ferrosilicon. Low grade as it may be, however, it is nevertheless ferrosilicon, and as it is bought and sold as such in wholesale quantities by the trade and is chiefly used in the manufacture of ordinary basic steel, it certainly comes within the tariff designation "ferrosilicon used in the manufacture of steel."

Most of the importations contained from 13 to nearly 17 per cent silicon, and to say that the statute contemplated only a ferrosilicon containing from 25 to 50 per cent of ferrosilicon, ignores the fact that paragraph 184 of the tariff act of 1909 provided for ferrosilicon containing *not more than* 15 per cent of silicon as well as for ferrosilicon containing more than that percentage and that under that paragraph the commodity under consideration, whatever its use, could scarcely have escaped classification as ferrosilicon. Paragraph 102 of the tariff act of 1913, it is true, differs from paragraph 184 of the act of 1909 inasmuch as it does not provide for two classes of ferrosilicon, but for such ferrosilicon only as is used in the manufacture of steel. Nevertheless, while the later provision may exclude ferrosilicon, which because of a high phosphorus, sulphur, aluminum, titanium, or other content, can not be used for the making of steel, it can hardly be contended that it excludes a ferrosilicon which is actually used for the manufacturing purpose specified.

We do not think that United States *v.* Faunce (7 Ct. Cust. Appls., 426; T. D. 36984), cited by the board in its opinion, can be applied to the facts here involved. The commodity passed on in the Faunce case was known to the *trade as a special kind of pig iron* and was used, not for the purpose of manufacturing steel, but to make pig iron castings, whereas, in this case, the merchandise in controversy is known to the trade as *ferrosilicon* and *is chiefly*, if not exclusively, used *in the manufacture of* steel. The material described in the Faunce case and the material described in this case, it is true, contain about the same percentage of silicon, yet apparently because manganese is present in one and is not present in the other except as a trace, the commodities are so different that one though unfit for the manufacture of steel can be moulded into tough vessels susceptible of machining, while the other is suitable for steel making and is wholly unavailable for making castings because lack of manganese leaves it so brittle that articles made of it can not be machined.

On the record as made we find that the commodity involved in this appeal is a low grade ferrosilicon used for the manufacture of steel, and that it was therefore dutiable as assessed.

The decision of the Board of General Appraisers is *reversed.*