(C.D. 2623)

C. J. Tower & Sons of Buffalo, Inc. *v.* United States

United States Customs Court, Second Division

(Decided March 2, 1966)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Earl R. Lidstrom* of counsel) for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Morris Braverman*, trial attorney), for the defendant.

Before RAO and FORD, Judges

RAO, Chief Judge: Certain merchandise invoiced as "Abrasive Sludge" was exported in bulk from Canada and entered at Buffalo, N.Y.

The collector classified this merchandise under paragraph 302(i) of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, which reads as follows:

Ferrosilicon:
    Containing 8 per centum or more of silicon and less than 60 per centum,

and assessed duty at the rate there provided, to wit, 0.8 of a cent per pound on the silicon content.

By timely protest, plaintiff states this "merchandise is properly free of duty under Par. 1664" of the Tariff Act of 1930, which reads as follows:

Metallic mineral substances in a crude state, such as drosses, skimmings, residues, brass foundry ash, and flue dust, not specially provided for.

At the trial, Government counsel moved to incorporate the record in protest 217087–K, reported as *C. J. Tower & Sons* v. *United States*, 46 CCPA 36, C.A.D. 692, which affirmed *Same* v. *Same*, 38 Cust. Ct. 257, C.D. 1872. The trial judge declined to grant or deny the motion

and took it under advisement. Hence, this motion will be considered herein and disposed of *infra*.

Plaintiff introduced the testimony of three witnesses, as well as a jar of material allegedly fairly representative of the merchandise under consideration which was received in evidence as plaintiff's exhibit 1. Plaintiff also introduced a jar of material allegedly a by-product ferrosilicon, which was received without objection and marked exhibit 2. Both products come out of the same operation, the production of aluminum oxide abrasives.

Defendant introduced the testimony of three witnesses, as well as a letter, dated December 14, 1960, addressed to plaintiff. This letter was written by the Hanna Furnace Corp., Buffalo, N.Y., to which the imported merchandise was delivered by the Canadian exporter, Lionite Abrasives, Ltd. It was received in evidence as defendant's exhibit A. It is therein recited that the Hanna firm received two truckloads of abrasive sludge on May 10, 1960, and seven truckloads on July 7, 1960; that its records indicate that an analysis was made on April 1, 1960, which showed a silicon content of 8.39 percent; iron, 56.39 percent; aluminum oxide, 21.60 percent; titanium, 3.30 percent; and chromium, 0.39 percent. It was later explained by plaintiff's witness Mr. Bray that the above analysis was not of the instant imported material, but of a sample of material taken from a pile in Canada containing about 4 or 5 thousand tons, which tonnage included the merchandise now under consideration.

As this case has been presented for decision, there is virtually no dispute concerning essential facts although the record is replete with evidence tending to challenge the validity of Government samples and analyses of the imported merchandise. It does not now appear that plaintiff pursues these technical issues or contends that any of the batches of the subject material tests less than 8 percent or more than 60 percent of silicon. Plaintiff concedes that the imported material is a metal containing at least 50 percent of iron.

In claiming that the instant merchandise is properly entitled to free entry as metallic mineral substances in a crude state within paragraph 1664, *supra*, plaintiff now relies upon the contention that by virtue of the presence in substantial quantities, as indicated, *infra*, of certain metallic contaminants, the imported material is not ferrosilicon under any circumstances.

The issue presented is, therefore, whether plaintiff has established that the imported merchandise is not "ferrosilicon" as contemplated by paragraph 302(i), as modified, *supra*.

It appears from the record, and more particularly from the testimony of plaintiff's witnesses Paul Blum, owner of Paul Blum Co. of

Buffalo, N.Y., the importer of this merchandise, and David K. Bray, a chemical engineer, who is manager of quality control of General Abrasive Co., Niagara Falls, N.Y., the so-called "parent" of Lionite Abrasives, Ltd., Niagara Falls, Ontario, Canada, with whose production he is acquainted, that the instant merchandise represented by exhibit 1 comes out of the same manufacturing operation as does exhibit 2, both being by-products in the production of aluminum oxide abrasives. The manufacturing process is substantially as follows:

Bauxite, to which coke, borings, and turnings are added, is furnaced in an electric arc furnace which is a cylindrical steel shell known as the Higgins-type furnace; it is filled approximately one-third full with the above mixture; the arc is struck and the furnace is then periodically fed with a mixture of the above materials which melt until the furnace shell is completely full. The furnace shell is then water-cooled on the outside by a ring placed around the upper part of the furnace, permitting water to cascade over the outer shell. After such action, the material is allowed to cool for about 4 or 5 days, by which time it is safe to work with it. The ingot thus produced solidifies, allegedly resulting in "almost pure metallic ferrosilicon" (exhibit 2) collecting at the bottom, with alumina at the top. The layer in-between them is where merchandise represented by exhibit 1 comes from. The ingots are crushed by drop-weights and broken down into chunks about a foot square, from which selection is made of those sections suitable for abrasives. The remainder is crushed and passed over magnetic separators to remove metallic iron or ferrosilicon still present in the material, resulting in by-product ferrosilicon and abrasive sludge, represented, respectively, by exhibit 2 and exhibit 1.

Mr. Blum also testified that exhibit 2 is a practically pure material, purchased as by-product ferrosilicon, while exhibit 1 is a waste material, a mixture of alumina, iron, silicon, and other elements, mostly contaminants, which is purchased as abrasive furnace sludge or abrasive furnace sludge tailings or tailings; that he sometimes calls exhibit 1 "ferrosilicon scrap"; that exhibit 2 can be used in making steel as an alloy, while exhibit 1 is used as a charge in the blast furnace similar to ore in making raw iron, pig iron.

Mr. Bray also testified that abrasive sludge consists of "iron, silicon, aluminum, a little carbon-silica, probably, and a range in trace elements which are usually very, very small"; that exhibit 1 is a metallic mineral mixture in a crude state; that both exhibits 1 and 2 contain ferrosilicon; that it is not impossible for exhibit 1 to have a silicon content over 10 percent; that it could be called a low-grade ferrosilicon, but he calls it "tailings."

Plantiff's other witness, Charles E. Makey, testified that his formal

education ended with high school; that he is chief chemist for the Hanna Furnace Corp. which purchased the nine truckloads of material involved in this case and that it was not analyzed; that his firm produces pig iron of different grades with silicon content up to 20 percent; that exhibit 1 is a fairly representative sample of the imported merchandise and that exhibit 2 is not representative of the purchased material; that exhibit 1 was used to make pig iron which is sold to foundries making motor blocks, stoves, sewer plates, castings, and other articles; that the imported material was used by throwing it "in the top of the furnace with iron ore, and coke, and limestone, to produce pig iron"; that because of its composition, they could only use 100 pounds in a charge of 22,000 pounds which he termed "wasting it" to "get rid of it."

Defendant's witnesses Charles Giglia, a customs examiner and acting appraiser at Buffalo, N.Y., and Richard D. Walton, a customs examiner stationed at the Peace Bridge, testified regarding samples taken from the imported nine truckloads, which were sent to the United States Customs Laboratory at New York City. Defendant's other witness, Isidore Schnopper, assistant chief chemist at the above laboratory, testified regarding analyses made of the said samples. He stated, based upon official records, that analysis reports were made as to silicon content and that copies of said reports were sent to the inquiring port. He stated that at the request of Government counsel, further analyses were made of said samples which were still available at the laboratory. He testified that the combined analyses showed the following content results:

As to entry 015574: Aluminum oxide, 11.6 percent; titanium oxide, 5.0 percent; magnesium oxide, 5.8 percent; carbon, 0.9 percent; manganese oxide, 0.6 percent; calcium oxide, 4.9 percent; and silicon, 15.0 percent.

As to entry 0705: Aluminum oxide, 15.6 percent; titanium oxide, 7.3 percent; magnesium oxide, 1.7 percent; carbon, 1.1 percent; silicon, 9.8 percent in lot No. 1, 8.6 percent in lot No. 2, and 9.3 percent in lot. No. 3.

The silicon content in the subsequent tests in each entry agreed with the reported silicon content in the earlier test. While these analyses do not state the iron content, plaintiff's brief, page 23, states: "It is not contradicted that the imported material contains at least 50% of iron, which is a metal."

Defendant's counsel, as heretofore noted, moved to incorporate the record in C.A.D. 692, *supra*. The trial judge took the motion under advisement and the motion now confronts this division of the court for decision. See *Stetson Glove Company* v. *United States*, 24 Cust.

Ct. 105, 111, C.D. 1217 (citing *United States* v. *Great Pacific Co., Shui Tai & Co.*, 23 CCPA 319, T.D. 48192).

Rule 20 of the rules of this court, so far as pertinent herein, provides:

When a case is under consideration which involves questions of law and fact substantially the same in character as were involved in another case which has been previously decided, or tried and submitted to the court for decision, the record, or any part thereof, in such previous case may, within the discretion of the court, be admitted in evidence in the pending case upon motion of either party * * *.

The merchandise involved in C.A.D. 692, which affirmed C.D. 1872, was classified as ferrosilicon containing 8 or more, but less than 30 per centum of silicon, under paragraph 302(i) of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802. The actual silicon content of the two importations there in controversy, as shown in the Customs Court's decision, C.D. 1872, *supra*, was 16.10 and 16.57 percent, respectively. The range of components in the various shipments was stated to be: Iron, 73 to 83 percent; silicon, 11 to 20 percent; aluminum, 0.3 to 4.5 percent; carbon, 0.1 to 1.0 percent; phosphorous and manganese, traces. Claim was therein made that the merchandise was free of duty under paragraph 1664 of said tariff act, as metallic mineral substances in a crude state, such as drosses, skimmings, residues, brass foundry ash, and flue dust, not specially provided for.

In the case at bar, the involved merchandise was classified as ferrosilicon containing 8 per centum or more of silicon and less than 60 per centum under paragraph 302(i) of the Tariff Act of 1930, as modified by the sixth protocol, *supra*. Plaintiff claims the merchandise is free of duty under paragraph 1664 of said tariff act. The actual silicon content of the merchandise in the two entries here involved is shown, *supra*.

As is evident from the analysis of the merchandise in C.A.D. 692, the components and the percentages thereof, in the importations there under consideration, were different from those which the instant merchandise contains, and no witness gave any testimony that the two sets of importations were similar. If anything, the contrary is indicated in the statement of the witness Makey that plaintiff's exhibit 2 is not representative of the material that his company purchased. Moreover, the question in the cited case was one of commercial designation, predicated upon an admission that the merchandise in issue was embraced within the common meaning of the term "ferrosilicon." The court's conclusion that the term "ferrosilicon" was not susceptible of proof of commercial designation has no bearing upon the problems which confront us in the present instance. Here we are concerned

with the question of whether a substance of a specified composition is or is not ferrosilicon. Neither the principles involved nor the merchandise imported have been shown to be sufficiently similar to warrant incorporation of the record in the cited case.

In *Bullocks, Inc.* v. *United States*, 13 Cust. Ct. 62, C.D. 870, cited in defendant's brief, the court concluded that "The subject matter" in the case sought to be incorporated (*O. E. Barrant* v. *United States*, 6 Cust. Ct. 516, Abstract 45233) and that in the *Bullocks* case is "obviously the same, and we are therefore constrained to grant the motion for incorporation thereof." Insofar as the instant case and C.A.D. 692 are concerned, we cannot say, on the record as made herein, that the "subject matter * * * is obviously the same" or that the facts are the same. Hence, in the considered discretion of the court, we sustain plaintiff's objection to incorporation and deny the motion of defendant. *The A. W. Fenton Co., Inc.* v. *United States*, 44 Cust. Ct. 16, C.D. 2147.

Consideration must be given to the issue as to whether plaintiff has established that the imported merchandise is not "ferrosilicon," as contemplated by paragraph 302(i), as modified, *supra*.

The collector classified the importations under consideration as "ferrosilicon" containing percentages of silicon within the range provided for in paragraph 302(i) of the Tariff Act of 1930, as modified, *supra*, at the dutiable rate of 0.8 of a cent per pound on the silicon content. Evidence offered by the Government chemist tends to support those findings, and they are not here brought into dispute by plaintiff. Nor does importer dispute the fact that the imported material contains at least 50 percent of iron.

It is a well-settled principle in customs litigation that a presumption of correctness attaches to the collector's classification, and that the protesting importer has the twofold burden of proving (1) that the collector's classification is erroneous, and (2) that the classification for which he contends is correct. *Bob Stone Cordage Co. et al.* v. *United States*, 51 CCPA 60, 65, C.A.D. 838, and *Atlantic Aluminum & Metal Distributors, Inc.* v. *United States*, 47 CCPA 88, 91, C.A.D. 735, and cases cited therein. For reasons which will appear, *infra*, it is our considered opinion that plaintiff has failed to sustain its burden of proof.

Research has not been fruitful in revealing the precise quantity of iron and silicon, as well as of other various components present in "ferrosilicon." Material which contains various amounts of iron and silicon, as well as different quantities of other components, is called "ferrosilicon" by authors of technical books referred to in plaintiff's brief. The authors are in substantial agreement that ferrosilicon is

an alloy of iron and silicon which ordinarily contains other elements. We refer, *infra*, to some of those technical books.

Chemical Analysis of Iron and Steel (1950) by G. E. F. Lundell, Ph. D., James Irvin Hoffman, Ph. D., and H. A. Bright, M.S., at page 442, states that—

The ordinary constituents of ferrosilicon (besides silicon and iron) are aluminum, manganese, copper, titanium, chromium, nickel, calcium, carbon, phosphorus, and sulphur. Some of these, for example, carbon and sulphur, are usually present in insignificant amounts. For A.S.T.M. and Federal specifications for ferrosilicon, see Table 36.

Table 36, above referred to, is shown as a footnote on page 442, *supra*. Several grades of ferrosilicon standard samples are indicated, no grade showing less than 97 percent in the aggregate of iron and silicon. The individual other elements are not as much as the same elements shown, *supra*, in the imported merchandise represented by exhibit 1. There is no specification for low-grade ferrosilicon.

Ferrous Process Metallurgy (1954) by John L. Bray, at page 272, states that "ferroalloys are used for desulfurization, deoxidation, or to confer special properties on the finished steel." At page 278, it is stated that it is necessary to add to the charge, to produce satisfactory open hearth steel, "certain elements to (1) give steel of the desired chemical composition or to (2) eliminate, or counteract, the effect of oxides or other impurities." It further states that nickel may be used in relatively pure form of the element while "others, such as manganese, silicon, * * * are added in the form of ferroalloys, * * *." It further states that "The alloy should not introduce into the melt excessive quantities of carbon or other elements not desired in the finished steel, * * *." Included in the discussion of ferroalloys is a reference to ferrosilicon which shows that it is generally composed of silicon and iron, with maximum amounts of 0.15 percent carbon, 0.05 percent phosphorus, and 0.04 percent sulphur. It will be observed that the ferrosilicon described in this work relates to the production of steel of a desired chemical composition, or for the elimination or counteraction of oxides or other impurities. It refers to the *general* composition of ferrosilicon. Thus, these requirements are for certain specifically desired steel and, therefore, do not necessarily apply to the instant importation or to ferrosilicon which is provided for by statute without reference to its use.

Encyclopedia of Chemical Technology (1954) by Raymond E. Kirk and Donald F. Othmer, volume 12, at page 363, states that ferrosilicon ranges from 8 to 95 percent in silicon content; that various grades of ferrosilicon (seven grades are shown in table VI, page 50, volume 8, of such treatise, which in no case indicates the presence of

elements other than silicon or iron, in significant amounts) "are used primarily in the production of iron and steel because they are the most effective and economical means of deoxidizing (removing and eliminating oxides and oxygen from molten iron and steel) and alloying." The source for such grades is stated to be ASTM A100–39. Here again the emphasis is upon use, a consideration which tends to affect the composition of ferrosilicon for its particular application, but does not appear to be a determinant of ferrosilicon for tariff purposes.

The Condensed Chemical Dictionary, 4th edition (1950), revised by Arthur and Elizabeth Rose, at page 293, stated that ferrosilicon is an alloy of iron and silicon which is used to add silicon to steel and iron; that small quantities of silicon deoxidize the iron and larger amounts impart special properties; that ferrosilicon is available in six grades from 15 percent to 90–95 percent ferrosilicon. A typical analysis of silicon, 14–18 percent, is said to contain carbon, 1 percent; phosphorus, 0.05 percent; and sulphur, 0.04 percent, each being a maximum. This seems to refer to regular or standard grades of ferrosilicon and not to low-grade ferrosilicon, a term applied to exhibit 1.

Plaintiff's brief refers to other technical works and quotes from some of them. We have considered them, but do not find that they reflect important differences from those works especially mentioned, *supra*. We do not consider them as indicating that the imported product is not ferrosilicon as contemplated by the statute here involved.

We note that Summary of Tariff Information (1929), page 609, indicates that ferrosilicon is an alloy of iron and silicon and that silicon content ranges from 7 or 8 percent to over 90 percent. Summary of Tariff Information (1948), volume 3, part 1, page 51, states the range of silicon in ferrosilicon to be from 7 percent to 96 percent, and that "Canada which is the source of almost all imports supplies principally low-grade ferrosilicon." The imported product comes from Canada.

We observe that ASTM Standards, 1964, part 4, at page 120, shows Tentative Specification for Ferrosilicon, ASTM Designation: A 100–63T revised March 21, 1963. It covers six regular grades of ferrosilicon, designated A, B, C, D, E, and F, and "sub-grades designated as low-aluminum, boron-bearing, and calcium-bearing." The percentage of constituents other than iron and silicon shown in the above ASTM designation is lower than those stated, *supra*, as present in the instant importations. However, there is no specification for "low-grade ferrosilicon," as such. The foregoing specification only relates

to *ferrosilicon* "sub-grades designated as low-aluminum, boron-bearing, and calcium-bearing."

In *United States* v. *Tower & Sons et al.*, 10 Ct. Cust. Appls. 155, T.D. 38401, the court held that *low-grade ferrosilicon*, which originated as a by-product in the manufacture of aluminous abrasives, known commercially as ferrosilicon and chiefly used in the manufacture of ordinary basic steel, is classifiable as "ferrosilicon" under paragraph 102, Tariff Act of 1913, notwithstanding that there is a much higher grade made to specifications and better adapted to the making of steel. Witnesses for the importer testified that commercial grades of ferrosilicon contained small quantities of sulphur, phosphorus, alumina, and titanium, whereas the importation there involved contained considerably more of those materials. The witness for the Government testified that the composition of the material was not inconsistent with low-grade ferrosilicon. The court stated that plaintiff's testimony—

* * * establishes nothing more than that the importation is not standard or high-grade ferrosilicon. On the other hand, the evidence submitted by the Government proves substantially without contradiction that the importation is at least a low-grade ferrosilicon. Low grade as it may be, however, it is nevertheless ferrosilicon, and as it is bought and sold as such in wholesale quantities by the trade and is chiefly used in the manufacture of ordinary basic steel, it certainly comes within the tariff designation "ferrosilicon used in the manufacture of steel."

The above provision for "ferrosilicon used in the manufacture of steel" is not contained in paragraph 302(i), as amended, *supra*. "Ferrosilicon," as contained therein, is an *eo nomine* designation with a limitation only as to silicon content. It provides for a product containing iron, and silicon of not less than the specified minimum or more than the specified maximum. By virtue of the classification, the presumption is that the involved merchandise is ferrosilicon as provided for by statute. That ferrosilicon may be low grade does not necessarily establish that it is not within the *eo nomine* provision, for the statute in respect to ferrosilicon does not establish standards of purity and does not contain a use provision.

In *C. J. Tower & Sons* v. *United States*, 30 Cust. Ct. 72, C.D. 1498, this court held that importations of aluminum silicon in the form of ingots, containing approximately 88 per centum of aluminum and 12 per centum of silicon, with certain adventitious impurities in minor percentages of copper, iron, magnesium, and titanium, were properly classified as aluminum silicon pursuant to the provisions of paragraph 302(j) of the Tariff Act of 1930. The court stated that said paragraph contains enumerated articles which are not qualified as to use and that plaintiff's attempt to establish that the provisions for silicon aluminum

and aluminum silicon "do not embrace those alloys when used for casting purposes but only when employed as so-called hardeners, master alloys, and additive alloys, is without merit." The above decision was affirmed in *Id.* v. *Id.*, 41 CCPA 195, C.A.D. 550, wherein the court stated that—

It is clear to us from a reading of the statute that Congress intended that the involved merchandise should be classified as "aluminum silicon." The provision for that material is clear and unambiguous and not restricted by use or any other qualification.

The above holdings by the courts are applicable to the merchandise presently under consideration. The qualification in the statute is that ferrosilicon must contain 8 per centum or more of silicon and less than 60 per centum, which is the fact as to the current merchandise, and it is clear and unambiguous that the provision does not restrict that commodity by use.

In *United States* v. *Williams Clarke Co., a/c American Agar and Chemical Co.*, 50 CCPA 67, 71, C.A.D. 822, agar agar was classified under paragraph 41 of the Tariff Act of 1930, which provides for "* * * agar agar, * * *" at 25 per centum ad valorem. By reason of the fact that the importation was of so low a quality as not to be salable, it was claimed that the merchandise was a scrap agar agar more properly provided for, *inter alia*, as waste. In rejecting that content, our appellate court stated:

* * * Paragraph 41 is an *eo nomine*, not a use, provision. As this court held in *Nootka Packing Co., et al* v. *United States*, 22 CCPA 464, 466–467, T.D. 47464, an *eo nomine* designation, with no terms of limitation, will ordinarily include all forms of the named article. Stated otherwise, all forms, grades and qualities of the named article are embraced by such a designation. See *United States* v. *Salomon*, 1 CCPA 246, T.D. 31277, and *United States* v. *Page N. Goffigon*, 43 CCPA 172, C.A.D. 625.

Since the collector classified the imported merchandise as agar agar under paragraph 41 as amended, the importer has the burden of showing this classification to be incorrect. We do not find sufficient evidence to sustain this burden. Although the importer's testimony indicates that the imported merchandise was so contaminated that it was not fit for use as agar agar by the importer, the testimony fails to establish that the imported agar agar, even though of a "scrap" grade, is not agar agar as the term is used in paragraph 41 of the Tariff Act of 1930 as amended. The testimony indicates that the imported merchandise was purchased as "scrap" agar after it was found by the witness to be "of too low quality in many respects to be salable." * * *

  \*   \*   \*   \*   \*   \*   \*

While the above testimony indicates that the imported merchandise was a very low grade of agar agar whose price was commensurate with

its quality, it does not establish that the merchandise is not within the *eo nomine* provision for agar agar. The statutory provision in issue does not establish standards of purity and does not contain any use provision. The fact that the imported merchandise was too contaminated for direct use in some fields as agar agar does not change its character. It is still agar agar. The importer's witness testified that "There are probably over 100 uses" for agar agar, some major, some minor. Merely because the contaminated scrap grade of agar agar was unsuited for certain direct uses by the importer does not mean that it was unsuited for all of the possible asserted uses of agar agar nor does it indicate that the imported merchandise is not agar agar. We think the merchandise imported as "scrap agar agar" should be classified as agar agar under paragraph 41 of the 1930 Act as modified.

We do not think the importer has presented evidence sufficient to overcome the burden of showing the collector's classification to be wrong.

See also *Crosse & Blackwell Co.* v. *United States*, 36 CCPA 33, C.A.D. 393, and *T. M. Duche & Sons, Inc., et al.* v. *United States*, 44 CCPA 60, C.A.D. 638.

The foregoing is applicable to the instant abrasive sludge, exhibit 1, which was classified as ferrosilicon containing 8 per centum or more of silicon and less than 60 per centum. Exhibit 1 is alleged by plaintiff's witnesses to be waste material having contaminations, which is used in blast furnaces to make pig iron and is sometimes called "ferrosilicon scrap." It contains a minimum of 8 percent of silicon and was adverted to as a low-grade ferrosilicon. Accordingly, it follows that the merchandise described as "abrasive sludge" has not been shown to be improperly classified under paragraph 302(i), as modified, *supra*.

The importer cites *United States* v. *C. J. Tower & Sons*, 40 CCPA 14, C.A.D. 491, wherein so-called "Abrasive Sludge 81," described as an unwanted by-product resulting from the treatment of bauxite to produce an abrasive, was classified under paragraph 302(i), as modified by the Canadian Trade Agreement, 74 Treas. Dec. 235, T.D. 49752, as "Ferrosilicon, containing 8 per centum or more of silicon and less than 30 per centum." The importer claimed and the court held it to be free of duty under paragraph 1664 of said act as "Metallic mineral substances in a crude state, * * *." It appears from the record that during the course of the trial, Government counsel stated that the merchandise had been improperly classified, as above, apparently because of a high carbon content, and claimed it to be properly dutiable under paragraph 302(o) of that act as "All alloys used in the manufacture of steel or iron, not specially provided for," at 25 per centum ad valorem. The determination of that issue, as the case was

presented to the court, rested upon proof of commercial designation of the term "alloys," as to which our appellate court stated:

It is clear to us that commercial designation of the term "alloys" has been amply proved by well-qualified witnesses and that such designation differs from the common meaning of the term.

·C.A.D. 491, *supra*, is distinguishable on many grounds. Here, there is no question of the meaning of the term "alloys" or of commercial designation. Nor does the Government presently repudiate the collector's classification of the merchandise as ferrosilicon. On the contrary, the Government's case rests upon the proposition that the subject merchandise "is the ferrosilicon provided for by Congress in the enactment of paragraph 302(i) of the Tarriff Act of 1930." Not only are the issues different, seemingly, and by reason of the high carbon content of the material in the said *Tower* case, so too are there substantial differences in the merchandise involved.

As our appellate court had occasion to observe in the later *Tower* case (C.A.D. 692)—

The case of *United States* v. *C. J. Tower & Sons*, 40 CCPA 14, C.A.D. 491, cited and discussed by appellant is not in point here, since it was not contended before this court that the merchandise there involved was ferrosilicon, and the decision merely holds that such merchandise was not an alloy within the commercial meaning of that term.

In C.A.D. 692, *supra*, the merchandise was shown by importer's witness to be an abrasive furnace ferrosilicon, a by-product of an electric furnace process of manufacturing a crude abrasive aluminum oxide from bauxite ore. The silicon content of the two importations there involved was 16.10 and 16.57 per centum, respectively. In holding that material to be ferrosilicon, the court stated:

While it appears that the merchandise falls within the broad language of paragraph 1664, it is evident that the express provision for ferrosilicon in paragraph 302(i) is more specific and will prevail unless appellant can establish a commercial meaning of the term "ferrosilicon" which will exclude the merchandise therefrom.

\* \* \* \* \* \* \*

It is true that there was evidence that the material involved in the case last cited [*United States* v. *Tower & Sons et al.*, 10 Ct. Cust. Appls. 155, T.D. 38401, decided May 1, 1920] was sold commercially as ferrosilicon. But regardless of the basis on which the judgment was rendered, the decision in that case clearly holds that as of its date, May 1, 1920, the term "ferrosilicon" included not only purposely produced and controlled products, but also by-products of widely varying silicon content.

The court further stated that the 1922 Tariff Act included, in paragraph 302, provision for ferrosilicon containing various amounts of

silicon from 8 to 90 percent or more, while the 1913 act did not contain express provisions as to the silicon content of ferrosilicon. The court presumed that when Congress passed the 1922 act, it was cognizant of the decision in *United States* v. *Tower & Sons et al.*, 10 Ct. Cust. Appls. 155, T.D. 38401 (decided May 1, 1920), wherein it had been held that a metallic product containing iron and silicon, which was a by-product of the manufacture of aluminum abrasives, was classifiable as ferrosilicon, under paragraph 102 of the Tariff Act of 1913, rather than as a crude mineral or metallic mineral substance in a crude state, albeit there is a much higher grade better adapted to making steel.

The court referred to its decision in T.D. 38401, *supra*, and stated:

* * * It is, of course, to be presumed that when Congress passed the Act of 1922 it was cognizant of the cited Tower decision; and we agree with the Customs Court that it is significant that the lower limit of silicon content fixed in that act at 8 percent corresponds closely to the lowest amount of silicon (8.80 percent) present in the imported merchandise of Tower. The inference is clear that Congress, in 1922, agreed with the holding that an uncontrolled by-product of the manufacture of aluminous abrasives might be properly classifiable as ferrosilicon.

The Act of 1930 contained provisions for ferrosilicon similar to those of the Act of 1922, and there is no reason to suppose that any change in the meaning of that term was intended.

The "inference" above referred to is equally applicable to the "uncontrolled by-product" here involved represented by exhibit 1.

Plaintiff urges that consideration be given to the fact that none of the technical books adverted to makes reference to "ferrosilicon" which contain significant amounts of elements other than iron and silicon. It is alleged that, because the record indicates that the imported material contains approximately 25–30 percent by weight of other elements, principally aluminum oxide with substantial amounts of titanium oxide and other oxides, which are undesirable elements. "Obviously, this is not material contemplated within the term 'ferrosilicon.'"

Paragraph 302 (i), *supra*, is an *eo nomine* provision without qualification as to use, and without indication as to constituent elements other than silicon, as to which silicon content, it is clear on the record that the importation conforms to the statutory provision. The technical books and Summaries of Tariff Information, 1929 and 1948, *supra*, state that ferrosilicon is an alloy of iron and silicon used to add silicon to steel and iron and that the silicon content may be from 7 or 8 percent to 90–95 percent. Plaintiff's witnesses Blum and Bray testified that the imported material was used in the manufacture of pig iron, the latter being used to produce such articles as motor blocks, stoves, sewer plates, castings, and other articles.

The imported material is sometimes called "ferrosilicon scrap," contains ferrosilicon, and could be called low-grade ferrosilicon, as testified to by plaintiff's three witnesses. Assistant Chief Chemist Schnopper of the customs laboratory at New York City testified that analyses made there showed the imported material "consisted partly of ferrosilicon, and various amounts of aluminum oxide, titanium oxide" and in one entry "a small amount of calcium oxide."

For the above reasons, as well as the judicial and legislative history of paragraph 302(i), we are constrained to hold, on the record, that plaintiff has failed to establish that the imported merchandise is not ferrosilicon, as contemplated by statute and as classified by the collector.

In view of the foregoing conclusion, it appears unnecessary to consider whether the imported merchandise is provided for under paragraph 1664, as contended by plaintiff. Even assuming, and without deciding it as a fact, that the imported merchandise is a "Metallic mineral substance(s) in a crude state, * * *, not specially provided for," in said paragraph 1664, the *eo nomine* provision in paragraph 302(i) must take precedent consideration.

We are of opinion that the importer has failed to establish by substantial or sufficient evidence that the collector's classification was wrong.

By reason of the foregoing, all claims in the instant protest are, therefore, overruled. Judgment will be entered accordingly.